**Electronically Filed
Supreme Court
SCAP-22-0000335
29-DEC-2023
10:52 AM
Dkt. 89 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

SCAP-22-0000335, SCAP-22-0000336, SCAP-22-0000337,
SCAP-22-0000340, SCAP-22-0000341, SCAP-22-0000343,
SCAP-22-0000344, and SCAP-22-0000345

CITY AND COUNTY OF HONOLULU, acting by and through the
HONOLULU AUTHORITY FOR RAPID TRANSPORTATION,
Plaintiff/Counterclaim Defendant-Appellee/Cross-Appellant,
vs.
VICTORIA WARD, LIMITED, a Delaware Corporation; 988 HALEKAUWILA,
LLC, a Delaware limited liability company; 1001 QUEEN, LLC, a
Delaware limited liability company; 1118 ALA MOANA, LLC, a
Delaware limited liability company; 1108 AUAHI, LLC, a Delaware
limited liability company; 1100 ALA MOANA, LLC, a Delaware
limited liability company; and ʻAʻALIʻI, LLC, a Delaware limited
liability company, Defendants/Counterclaim Plaintiffs-
Appellants/Cross-Appellees,
and
1240 ALA MOANA, LLC, a Delaware limited liability company; THE
HOWARD HUGHES CORPORATION, a Delaware corporation; VICTORIA WARD
ENTERTAINMENT CENTER, L.L.C., a Delaware limited liability
company; ASSOCIATION OF UNIT OWNERS OF 1001 QUEEN, a Hawaiʻi
nonprofit corporation; ASSOCIATION OF UNIT OWNERS OF ʻAʻALIʻI, an
unincorporated association; ASSOCIATION OF UNIT OWNERS OF 988
HALEKAUWILA, an unincorporated association; and WARD VILLAGE
OWNERS ASSOCIATION, a Hawaiʻi nonprofit corporation,
Defendants-Appellants/Cross-Appellees,
and

WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association; BANK OZK, fka BANK OF THE OZARKS, an Arkansas state-chartered bank; GENERAL ELECTRIC COMPANY, a New York corporation, as successor by merger to GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation; BANK OF HAWAII, a Hawai'i corporation, as trustee under (a) that certain Land Trust Agreement and Conveyance dated October 21, 2004 (Trust No. 89433) and filed as Land Court Document No. 3188119, and (b) that certain Land Trust Agreement and Conveyance dated October 21, 2004 (Trust No. 89434) and filed as Land Court Document No. 3188118; FIRST HAWAIIAN BANK, a Hawai'i corporation, as trustee under (a) that certain unrecorded Land Trust Agreement dated September 20, 2006 (Trust No. FHB-TRES 200601), and (b) that certain unrecorded Land Trust Agreement dated September 20, 2006 (Trust No. FHB-TRES 200602); HI 120 REAL ESTATE COMPANY, INC., a Hawai'i corporation, fka CONSOLIDATED AMUSEMENT THEATRES, INC., a Hawai'i corporation; CONSOLIDATED ENTERTAINMENT, INC., a Nevada corporation, fka CONSOLIDATED AMUSEMENT THEATRES, INC., a Nevada corporation; CONSOLIDATED ENTERTAINMENT, LLC, a Nevada limited liability company; LONGS DRUG STORES CALIFORNIA, L.L.C., a California limited liability company; DAVE & BUSTER'S OF HAWAII, INC., a Hawai'i corporation; WARD COURT DEVELOPMENT, LLC, a Hawai'i limited liability company; ROSS DRESS FOR LESS, INC., a Virginia corporation; CG FAMILY, INC., a Hawai'i corporation; and WFM HAWAII, LLC, a Hawai'i limited liability company,
Defendants-Appellees/Cross-Appellees.

(CAAP-22-0000335, CAAP-22-0000336, CAAP-22-0000337, CAAP-22-0000340, CAAP-22-0000341, CAAP-22-0000343, CAAP-22-0000344, and CAAP-22-0000345)

---

SCAP-22-0000338

CITY AND COUNTY OF HONOLULU, acting by and through the HONOLULU AUTHORITY FOR RAPID TRANSPORTATION,
Plaintiff/Counterclaim Defendant-Appellee/Cross-Appellant,
vs.
VICTORIA WARD, LIMITED, a Delaware Corporation; 988 HALEKAUWILA, LLC, a Delaware limited liability company; 1001 QUEEN, LLC, a Delaware limited liability company; 1118 ALA MOANA, LLC, a Delaware limited liability company; 1108 AUAHI, LLC, a Delaware limited liability company; 1100 ALA MOANA, LLC, a Delaware

2

limited liability company; and 'A'ALI'I, LLC, a Delaware limited liability company, Defendants/Counterclaim Plaintiffs-Appellants/Cross-Appellees,
and
1240 ALA MOANA, LLC, a Delaware limited liability company; THE HOWARD HUGHES CORPORATION, a Delaware corporation; VICTORIA WARD ENTERTAINMENT CENTER, L.L.C., a Delaware limited liability company; ASSOCIATION OF UNIT OWNERS OF 1001 QUEEN, a Hawai'i nonprofit corporation; ASSOCIATION OF UNIT OWNERS OF 'A'ALI'I, an unincorporated association; ASSOCIATION OF UNIT OWNERS OF 988 HALEKAUWILA, an unincorporated association; and WARD VILLAGE OWNERS ASSOCIATION, a Hawai'i nonprofit corporation, Defendants-Appellants/Cross-Appellees,
and
WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association; BANK OZK, fka BANK OF THE OZARKS, an Arkansas state-chartered bank; GENERAL ELECTRIC COMPANY, a New York corporation, as successor by merger to GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation; BANK OF HAWAII, a Hawai'i corporation, as trustee under (a) that certain Land Trust Agreement and Conveyance dated October 21, 2004 (Trust No. 89433) and filed as Land Court Document No. 3188119, and (b) that certain Land Trust Agreement and Conveyance dated October 21, 2004 (Trust No. 89434) and filed as Land Court Document No. 3188118; FIRST HAWAIIAN BANK, a Hawai'i corporation, as trustee under (a) that certain unrecorded Land Trust Agreement dated September 20, 2006 (Trust No. FHB-TRES 200601), and (b) that certain unrecorded Land Trust Agreement dated September 20, 2006 (Trust No. FHB-TRES 200602); HI 120 REAL ESTATE COMPANY, INC., a Hawai'i corporation, fka CONSOLIDATED AMUSEMENT THEATRES, INC., a Hawai'i corporation; CONSOLIDATED ENTERTAINMENT, INC., a Nevada corporation, fka CONSOLIDATED AMUSEMENT THEATRES, INC., a Nevada corporation; CONSOLIDATED ENTERTAINMENT, LLC, a Nevada limited liability company; LONGS DRUG STORES CALIFORNIA, L.L.C., a California limited liability company; DAVE & BUSTER'S OF HAWAII, INC., a Hawai'i corporation; WARD COURT DEVELOPMENT, LLC, a Hawai'i limited liability company; ROSS DRESS FOR LESS, INC., a Virginia corporation; CG FAMILY, INC., a Hawai'i corporation; and WFM HAWAII, LLC, a Hawai'i limited liability company, Defendants-Appellees/Cross-Appellees.

(CAAP-22-0000338)

3

SCAP-22-0000352

CITY AND COUNTY OF HONOLULU, acting by and through the
HONOLULU AUTHORITY FOR RAPID TRANSPORTATION,
Plaintiff/Counterclaim Defendant-Appellant,
vs.
VICTORIA WARD, LIMITED, a Delaware Corporation; 988 HALEKAUWILA,
LLC, a Delaware limited liability company; 1001 QUEEN, LLC, a
Delaware limited liability company; 1118 ALA MOANA, LLC, a
Delaware limited liability company; 1108 AUAHI, LLC, a Delaware
limited liability company; 1100 ALA MOANA, LLC, a Delaware
limited liability company; and 'A'ALI'I, LLC,
a Delaware limited liability company,
Defendants/Counterclaim Plaintiffs-Appellees,
and
1240 ALA MOANA, LLC, a Delaware limited liability company; THE
HOWARD HUGHES CORPORATION, a Delaware corporation; VICTORIA WARD
ENTERTAINMENT CENTER, L.L.C., a Delaware limited liability
company; ASSOCIATION OF UNIT OWNERS OF 1001 QUEEN, a Hawai'i
nonprofit corporation; ASSOCIATION OF UNIT OWNERS OF 'A'ALI'I, an
unincorporated association; ASSOCIATION OF UNIT OWNERS OF 988
HALEKAUWILA, an unincorporated association; and WARD VILLAGE
OWNERS ASSOCIATION, a Hawai'i nonprofit corporation,
Defendants-Appellees,
and
WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking
association; BANK OZK, fka BANK OF THE OZARKS, an Arkansas
state-chartered bank; GENERAL ELECTRIC COMPANY, a New York
corporation, as successor by merger to GENERAL ELECTRIC CAPITAL
CORPORATION, a Delaware corporation; BANK OF HAWAII, a Hawai'i
corporation, as trustee under (a) that certain Land Trust
Agreement and Conveyance dated October 21, 2004 (Trust No.
89433) and filed as Land Court Document No. 3188119, and
(b) that certain Land Trust Agreement and Conveyance dated
October 21, 2004 (Trust No. 89434) and filed as Land Court
Document No. 3188118; FIRST HAWAIIAN BANK, a Hawai'i corporation,
as trustee under (a) that certain unrecorded Land Trust
Agreement dated September 20, 2006 (Trust No. FHB-TRES 200601),
and (b) that certain unrecorded Land Trust Agreement dated
September 20, 2006 (Trust No. FHB-TRES 200602); HI 120 REAL
ESTATE COMPANY, INC., a Hawai'i corporation, fka CONSOLIDATED
AMUSEMENT THEATRES, INC., a Hawai'i corporation; CONSOLIDATED
ENTERTAINMENT, INC., a Nevada corporation, fka CONSOLIDATED
AMUSEMENT THEATRES, INC., a Nevada corporation; CONSOLIDATED
ENTERTAINMENT, LLC, a Nevada limited liability company; LONGS
DRUG STORES CALIFORNIA, L.L.C., a California limited liability

4

company; DAVE & BUSTER'S OF HAWAII, INC., a Hawai'i corporation;
WARD COURT DEVELOPMENT, LLC, a Hawai'i limited liability company;
ROSS DRESS FOR LESS, INC., a Virginia corporation; CG FAMILY,
INC., a Hawai'i corporation; and WFM HAWAII, LLC,
a Hawai'i limited liability company,
Defendants-Appellees.

(CAAP-22-0000352)

---

SCAP-22-0000335
(Consolidated with SCAP-22-0000336, SCAP-22-0000337,
SCAP-22-0000338, SCAP-22-0000340, SCAP-22-0000341,
SCAP-22-0000343, SCAP-22-0000344, SCAP-22-0000345,
and SCAP-22-0000352)

APPEALS FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CC181001564)

DECEMBER 29, 2023

RECKTENWALD, C.J., McKENNA, AND EDDINS, JJ.,
CIRCUIT JUDGE BROWNING, IN PLACE OF NAKAYAMA, J., RECUSED,
AND CIRCUIT JUDGE KAWASHIMA, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I. INTRODUCTION

This case concerns the amount of just compensation the
Honolulu Authority for Rapid Transportation ("HART") must pay
for approximately two acres worth of easements on property
previously owned by Victoria Ward, Limited ("Victoria Ward").
That property is located in Victoria Ward's multi-billion dollar
Ward Village development in the Kaka'ako neighborhood of O'ahu.
HART obtained the easements to construct portions of its fixed
rail system and a proposed Kaka'ako Station.

Victoria Ward seeks just compensation from HART for the takings. Victoria Ward's claimed damages are comprised of the fair market value of easements on Victoria Ward's property, plus between $65 million and over $100 million for alleged severance damages.

Severance damages compensate property owners for devaluation of non-taken portions of property. In addition to seeking damages for lost development opportunities, Victoria Ward claims that it was forced to modify, redesign, and/or relocate other building plans in a manner resulting in less efficient, less valuable, and less profitable projects relative to what the development could have been worth absent rail and the associated takings.

The circuit court granted a dozen summary judgment motions, which are the subject of this interlocutory appeal.[1] These summary judgment orders touch on a wide variety of disputes. Most importantly, the circuit court ruled that Victoria Ward is estopped from seeking severance damages, though the orders also address such issues as the appropriate valuation methodology for lost parking spaces, the extent to which a party may be entitled to just compensation for a speculative construction project, and the effect of pre-dispute

---

[1] The Honorable John M. Tonaki presided.

communications and local ordinances on a condemnee's ability to seek just compensation.  In addition to appealing the partial summary judgment orders, the parties appeal an order pausing the accrual of blight of summons interest, and two orders denying or denying in part motions to strike.

We acknowledge the factual and legal complexity of this case, and the circuit court's legitimate concern with narrowing the issues for trial.  However, we conclude that in several circumstances, the circuit court incorrectly used summary judgment to resolve disputed factual issues.  Most notably, the question of whether Victoria Ward is estopped from seeking severance damages involves disputed questions of fact and should be presented to a jury.

We affirm (1) the orders granting HART's partial summary judgment motions 2 and 7, (2) the orders granting Victoria Ward's partial summary judgment motions 1 and 3, and (3) the order pausing blight of summons damages accrual during pendency of this appeal.  We affirm in part and vacate in part the order granting HART's partial summary judgment motion 1.

We vacate (1) the orders granting HART's partial summary judgment motions 3, 5, 9, 10, and 11; and (2) the orders granting Victoria Ward's partial summary judgment motions 2 and 4.

We dismiss (1) HART's cross-appeal concerning the denial of their motion to strike J. Douglas Ing's declaration and (2) HART's appeal concerning the grant in part and denial in part of their motion to strike Brian Lee's and Steven J. Scott's respective declarations.

We remand the case to the circuit court for further proceedings.

## II.  BACKGROUND

### A.  Factual Overview

#### 1.  The takings

This appeal arises out of a condemnation action filed in 2018 by the City & County of Honolulu ("C&C") acting by and through HART, against Victoria Ward to take multiple acres of Victoria Ward's sixty-acre "master-planned and permitted, mixed-use development community" located in Kaka'ako ("Ward Village"). The purpose of the taking was to construct a segment of railway and the proposed Kaka'ako Station within Ward Village.

In its current state, Ward Village is planned to comprise six distinct "land blocks."  All of the physical takings by HART occur on Land Block 1 and Land Block 5, and the Kaka'ako Station is slated to be built on Land Block 1 in a manner that would sever the property.  The location of the Kaka'ako Station was central to two summary judgment orders on appeal, as Victoria Ward alleges that the Station prevents it

4

from building a sixth condominium tower on Land Block 1 (the "Lost Tower").

A critical question before this court is whether Victoria Ward's severance damages claims are legally compensable, or if Victoria Ward is precluded from seeking severance damages due in large part to: (1) the Master Plan Permit language requiring a future rail project to be "addressed and incorporated" by Victoria Ward; (2) Victoria Ward's continued compliance with the Master Plan Permit, including physically modifying structures in order to accommodate rail; and (3) Victoria Ward's enjoyment of benefits in the form of preferential development opportunities and the receipt of billions of dollars in revenue as a result of the Master Plan Permit.

## 2. Ward Village planning and permitting

The Hawai'i Community Development Authority ("HCDA") is a key player in this dispute, though not a party to this appeal. HCDA is vested with rulemaking, planning, development, and financing authority with the mission of re-developing the Kaka'ako area. See Hawai'i Revised Statutes ("HRS") §§ 206E-4, -7, -31, -33 (2014). HCDA established rules and development plans for the Kaka'ako neighborhood, including the "Mauka Rules" first enacted in 1982 and subsequently amended numerous times. The Mauka Rules were promulgated in order to re-plan the Kaka'ako

neighborhood to meet various community needs including affordable housing, public facilities and open spaces, and mixed pedestrian-oriented and mixed-use development. Hawai‘i Administrative Rules ("HAR") § 15-22-1 (repealed 2011).

In April 2008, Victoria Ward's predecessor in interest, General Growth Properties, Incorporated ("GGP"), submitted a planned development application for Ward Village ("Master Plan Submittal" or "Submittal").[2] The HCDA reviewed the Master Plan Submittal because HCDA has planning jurisdiction over the Kaka‘ako district, where Ward Village is located.

HCDA approved Victoria Ward's Master Plan Submittal and issued its Findings of Fact, Conclusions of Law, and Decision and Order for a Master Plan Permit ("Master Plan Permit" or "Permit") in 2009. In the Master Plan Permit, HCDA noted that it reviewed the Master Plan Submittal to ensure that it was "consistent with the provisions of the Mauka Area Plan and [Rules]."

Planned developments like Ward Village benefit from greater planning flexibility in exchange for public benefits provided via the development project. See HAR §§ 15-22-110 to

---

[2]     The 2005 Mauka Rules were in effect at the time the Ward Village Master Plan Permit was approved by HCDA. See Mauka Area Rules, 15 HAR Chapter 22 (repealed 2011). Thus, Ward Village was subject to the provisions of the 2005 Mauka Rules and their detailed development regulations. HAR § 15-22-8 (repealed 2011).

-121. HCDA, through the Mauka Rules, encouraged particular forms of development in an "incentive zoning system." HAR § 15-22-110(c) (repealed 2011). The incentives available to developers under the 2005 Mauka Rules included benefits like preferential height limitations and greater density allowances. Id. Victoria Ward sought several modifications to development rules for their planned projects, and HCDA reviewed the requests on a project-by-project basis.

The Master Plan Permit itself does not entitle Victoria Ward to develop individual projects, and Victoria Ward is required to obtain a project permit from HCDA for each individual building project. As of 2018, HCDA had allegedly granted Victoria Ward seven individual project permits for condominium projects, and numerous permits for commercial developments comprising one-half of the total development allowable under the Master Plan Permit.

The Master Plan Submittal did not explicitly illustrate a Kaka'ako Station within Ward Village, and Victoria Ward asserts that the Submittal instead reflects plans to build the Kaka'ako Station "on or above Queen Street (rather than its currently planned location by HART on Victoria Ward's property)." Further, the Master Plan Submittal reflects plans to build a 240-foot mixed residential/office mid-rise building

on Land Block 1 over the parcel that HART now proposes as the site of the Kaka'ako Station.

The Master Plan Permit enumerated sixteen detailed conditions on Victoria Ward's development of Ward Village, including requirements for open space, cultural preservation, and reserved housing. None of the conditions explicitly refers to a rail project. Instead, the rail project is referenced in Paragraph 85 of the Master Plan Permit's Findings of Fact section which states in relevant part:

> High Capacity Transit Corridor and Station: The City and County of Honolulu's ("C&C") High Capacity Transit proposal could have a major impact on the proposed Master Plan. The C&C's current preferred transit route is situated within the Mauka portion of the master plan area. The proposed location of the transit station will influence access to residential areas and places of employment. [Victoria Ward] and the C&C have been engaged in discussions regarding the precise alignment and exact location for the transit station within the Master Plan area, and will continue to do so. As part of individual project development permit applications for this area, a more detailed transit route and station location shall be addressed and incorporated.

(Second emphasis added.)

The "addressed and incorporated" language of Paragraph 85 of the Master Plan Permit was central to many of the circuit court's partial summary judgment orders, and it plays a key role in a number of the interlocutory appeals before this court.

In December 2010, Victoria Ward and HCDA entered into the Master Plan Development Agreement for the Ward Neighborhood Master Plan ("Master Plan Development Agreement" or "Development

8

Agreement"), which granted Victoria Ward the right to develop Ward Village under the Master Plan Permit. The Development Agreement also stated that Victoria Ward would proceed in compliance with the Permit and that the Permit's terms and conditions would "remain in full force and effect." The Development Agreement specified that the Master Plan Permit would last for a term of fifteen years, and it is set to expire on January 14, 2024.

In addition to the language in Paragraph 85 of the Master Plan Permit, requiring a future rail route and station location to be "addressed and incorporated," Victoria Ward and its predecessor in interest, GGP, made numerous representations to public authorities stating that rail would be integrated into Ward Village. The Master Plan Submittal itself referred to "connections with a balanced set of transportation modes," "[e]fficient and alternative transportation modes," and "[t]ransportation oriented development connections." A subsequent project application submitted by Victoria Ward five years later stated that "[t]he rail station is planned to the [s]outh of the site and will further enhance public transportation options." HART asserts that Victoria Ward used similar statements to attract investment and sell units to the public, generating more than two billion dollars in revenue.

Based on the Master Plan Permit's "addressed and incorporated" language and Victoria Ward's subsequent conduct and representations, the circuit court granted HART's motion for partial summary judgment ("MPSJ") No. 3, precluding Victoria Ward from seeking the vast majority of the severance damages allegedly resulting from HART's taking. HART'S MPSJ No. 3 itself was central to the court's orders granting MPSJ Nos. 5, concluding that Victoria Ward's claim relating to the "Lost Tower" — or a luxury condominium tower on the site of the Kakaʻako Station — is too speculative, and 11, concluding that Victoria Ward's claims for severance damages for modifications to buildings fail as a matter of law.

Neither party disputes that Victoria Ward is entitled to some form of just compensation. Rather, a significant portion of the interlocutory appeals concern Victoria Ward's ability to collect severance damages for impacts to non-taken properties. The alleged impacts to Ward Village properties include stairwell enclosure, increased screening, and noise mitigation, among other claimed damages.

## B.    Procedural Background

HART filed its Complaint in October 2018 seeking to condemn approximately two acres of Victoria Ward's real property within the Ward Village master plan area. Victoria Ward filed an Answer and Inverse Condemnation Counterclaim ("Counterclaim")

10

in order to recover just compensation and severance damages for property interests taken or damaged.

After HART filed its Complaint, HART obtained an Order of Possession before final judgment through an expedited procedure under HRS § 101-29 (2012). The Order of Possession specified that HART was thereby awarded all real property interests it sought, as well as the ability to "do such work in the Easements as may be required for the purposes for which condemnation of the Easements is sought." Thus, HART already has possession of the properties in question, and this appeal solely concerns Victoria Ward's right to just compensation due to HART's takings.

In August 2021, HART filed multiple motions for partial summary judgment directed at establishing, as a matter of law, that Victoria Ward was precluded from pursuing a variety of damages claims. The circuit court granted a significant portion of HART's motions relating to severance damages, thereby limiting Victoria Ward's ability to recover such damages as part of its inverse condemnation counterclaim against HART.

Victoria Ward subsequently moved to file an interlocutory appeal of the circuit court orders granting or granting in part HART's MPSJs. The circuit court granted Victoria Ward's motion and also sua sponte allowed HART to appeal any adverse MPSJ orders. The circuit court additionally

11

paused the accrual of "blight of summons" interest during the pendency of the interlocutory appeal.

Victoria Ward filed nine notices of appeal: eight regarding summary judgment orders and one regarding the stay of "blight of summons" interest accrual.  HART filed a single notice of appeal regarding five orders: four partial summary judgment orders and an order granting in part and denying in part HART's motion to strike two exhibits.

HART applied to transfer each interlocutory appeal to this court, which granted the application and consolidated the appeals.  During the transfer application's pendency, HART moved to dismiss all of Victoria Ward's appeals for lack of subject matter jurisdiction.  Unless otherwise noted, these motions are denied.

### III.  STANDARD OF REVIEW

"An appellate court reviews the circuit court's grant of summary judgment de novo."  Hawaiian Dredging Constr. Co., Inc. v. Fujikawa Assocs., Inc., 142 Hawai'i 429, 434, 420 P.3d 360, 365 (2018) (brackets and internal quotation marks omitted) (quoting Gillan v. Gov't Emps. Ins. Co., 119 Hawai'i 109, 114, 194 P.3d 1071, 1076 (2008)).  "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. (quoting Hawaiʻi Rules of Civil Procedure ("HRCP") Rule 56(c) (2000)).

We view the evidence in the light most favorable to the non-movant. Winfrey v. GGP Ala Moana LLC, 130 Hawaiʻi 262, 271, 308 P.3d 891, 900 (2013). The movant bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. See Kaneohe Bay Cruises, Inc. v. Hirata, 75 Haw. 250, 258, 861 P.2d 1, 6 (1993). An opposing party may not counter a motion for summary judgment merely upon "allegations or denials of the adverse party's pleading," but instead "must set forth specific facts showing that there is a genuine issue for trial." HRCP Rule 56(e) (2000).

"[S]ummary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Balthazar v. Verizon Haw., Inc., 109 Hawaiʻi 69, 72, 123 P.3d 194, 197 (2005) (internal quotation marks omitted) (quoting State v. Zimring, 52 Haw. 472, 475, 479 P.2d 202, 204 (1970)).

Any issues requiring a different standard of review are so noted below.

13

## IV.  DISCUSSION

### A.  Victoria Ward is Not Precluded from Seeking Severance Damages

The central issue of this appeal concerns whether the Master Plan Permit and Victoria Ward's conduct preclude Victoria Ward from collecting severance damages arising from HART's takings — valued by the parties between $65 million and over $100 million.  Victoria Ward claims damages for the loss of valuable development opportunities and for allegedly being forced to undergo costly modifications and re-designs which further reduced the efficiency and value of the Ward Village properties.

We hold that, by entering into the Master Plan Permit and Development Agreement, Victoria Ward is obligated to address and incorporate rail.  But it is the province of the jury to determine the contours of this obligation and to calculate the amount of severance damages, if any, to which Victoria Ward is entitled.

The order granting HART's MPSJ No. 1 is affirmed as to paragraphs 1(a), 1(c), 1(d), and 2, but vacated as to paragraph 1(b).  In light of the admissible evidence disputing HART's theory that Victoria Ward is precluded from seeking severance damages, the order granting HART's MPSJ No. 3 is vacated.  The order granting HART's MPSJ No. 11 is also vacated.  Finally, the

orders granting HART's MPSJ No. 2 and Victoria Ward's MPSJ No. 1 are affirmed.

> 1. **There is a genuine dispute of material fact as to whether Ordinance 07-001 and the Locally Preferred Alternative "established" the rail route and location of the Kaka'ako Station within Ward Village**

One important question is whether the rail route and Kaka'ako Station location were known at the time of the Master Plan Submittal, Master Plan Permit, Development Agreement, or subsequent individual project applications. HART's MPSJ No. 1 concerned the legal effect of Ordinance 07-001, enacted by the Honolulu City Council in 2007. Crucially, Ordinance 07-001 selected a "locally preferred alternative" (LPA) which generally defined a rail route and location for the Kaka'ako Station.[3] The LPA was a route chosen out of several viable options provided to the City Council by the Honolulu Department of Transportation Services. Specifically, Section V of the LPA (labelled "Section V — Nimitz Highway/Halekauwila Street/Kapiolani Boulevard") appears to show a route going through Ward Village along Halekauwila Street, through the location of the now-planned Kaka'ako Station, and finally continuing along Queen Street.

The circuit court's order granting in part and denying in part HART's MPSJ No. 1 specified:

---

[3] In addition to selecting the LPA, Ordinance 07-001 authorized the C&C to prepare an environmental impact statement for the LPA and established an excise tax to fund rail construction and operations.

1. There being no genuine issues of material fact, the Motion is GRANTED as follows:

   a. Ordinance 07-001 is a legally enforceable legislative action by the Honolulu City Council;

   b. The ordinance approved the locally-preferred alternative and <u>established</u> the alignment of rail and the Kakaʻako station <u>within Ward Village</u>; and

   c. The [HCDA] as the permitting authority for Kakaʻako, and the Ward Village area, was <u>obligated to consider Ordinance 07-001</u> in its planning and permitting;

   d. In its 2009 master plan permit for Ward Village, the HCDA, pursuant to Ordinance 07-001, required that as a part of individual project development permit applications, the high-capacity transit route and station location be <u>addressed and incorporated</u>.

2. There are genuine issues of material fact such that this Motion is DENIED as to Plaintiff's request for a ruling that the Victoria Ward, Ltd. Defendants cannot recover severance damages with regard to the Lost Tower (defined in the Motion as the alleged abandonment of the development of a 400-foot tall luxury condominium purportedly planned for the Kakaʻako Station site) or any other project directly in conflict with alignment of the rail line and station as defined in Ordinance 07-001. <u>The Court finds that at this point this is an issue that with consideration of the other factors must be submitted to the jury for its determination.</u>

(Emphases added.)

As set forth below, the circuit court was correct that Ordinance 07-001 was legally enforceable, HCDA was obligated to consider it, the Master Plan Permit required the rail route and Kakaʻako Station to be addressed and incorporated, and Victoria Ward was not precluded from recovering severance damages as a matter of law. However, the court erred in ruling that Ordinance 07-001 and the LPA "established" the rail alignment

16

and location of the Kaka'ako Station within Ward Village as a matter of law. Accordingly, the circuit court's order granting HART's MPSJ No. 1 is affirmed as to paragraphs 1(a), 1(c), 1(d), and 2, but vacated as to paragraph 1(b).

The parties dispute the extent to which the LPA "established" the location of the guideway and station, as opposed to simply expressing a preference. HART asserts that, although the rail alignment changed slightly since Ordinance 07-001 was enacted, the Ordinance and LPA made clear — at least two years prior to the grant of the Master Plan Permit in 2009 — that the rail guideway and Kaka'ako Station would be constructed within Ward Village in a manner consistent with the LPA. Consequently, HART argues that HCDA was under a legal obligation to require any Ward Village structures to "accommodate, and not conflict with," rail as set out in the LPA. As a result of HCDA's alleged obligation to ensure that all structures were in accord with the LPA, HART asserts that HCDA could not legally approve any projects that conflicted with the LPA. Thus, under HART's theory, Victoria Ward is precluded from recovering severance damages for any projects that would otherwise conflict with the rail line or Kaka'ako Station location, as defined by the LPA.

We disagree with HART's position. There is a dispute of fact as to whether the LPA established definite plans to

17

build the Kaka'ako Station within Ward Village, or if the LPA instead contemplated a station near, but outside of, Ward Village.

Ordinance 07-001's text simply states that "[t]he city administration is authorized to proceed" with preparing an environmental impact statement for the LPA, and with "planning and preliminary engineering." The Ordinance's text does not reflect certainty as to a rail route or station location. At oral argument, HART's attorneys indicated that the Master Plan Permit explicitly references the LPA as the rail route that Victoria Ward was obligated to address and incorporate. This is not entirely so. The Permit states that "[t]he C&C's current preferred transit route is situated within the Mauka portion of the master plan area." The text did not explicitly require Victoria Ward to incorporate the route as reflected in the LPA. Rather, the Permit's use of the word "current" and subsequent phrasing, "a more detailed transit route and station location shall be addressed and incorporated," indicate the tentative nature of the LPA and likelihood of future alterations, despite the existence of the LPA at the time of entry into the Master Plan Permit.

Consistent with this interpretation, the HCDA Staff Findings report prepared in response to the Master Plan Submittal similarly states that a preferred route and station

18

location had been identified, "but due to its tentative nature, the [Master Plan Submittal] does not identify the preferred route or exact station location for the proposed transit network," and that "the C&C's proposal for the alignment as well as [the] transit station within the Master Plan area still appears to be tentative and may change."

In sum, both parties present substantial evidence in support of their positions, and determination of the disputed question of whether Ordinance 07-001 and the LPA "established" the rail route must be presented to a jury.  Accordingly, we affirm the circuit court order granting HART's MPSJ No. 1 as to paragraphs 1(a), 1(c), 1(d) and 2, and vacate as to paragraph 1(b).

**2.    The Master Plan Permit does not preclude Victoria Ward from seeking severance damages as a matter of law**

The circuit court ruled that Victoria Ward complied with and benefitted from the Master Plan Permit such that Victoria Ward cannot recover severance damages arising out of its obligation to comply with the terms of the Master Plan Permit.  The circuit court order granting HART's MPSJ No. 3 specifically stated:

> 1. The Ward Neighborhood Master Plan, the HCDA's Findings of Fact, Conclusions of Law, and Decision and Order, and the Master Plan Development Agreement for the Ward Neighborhood (collectively, the "*Master Plan Permit*") required all project development permit applications to address and incorporate rail and the Kakaʻako station in the development of Ward Village.

19

2. Neither General Growth Properties, the Victoria Ward, Ltd. Defendants' predecessor in interest, nor any of the Victoria Ward, Ltd. Defendants ever challenged the Master Plan Permit. Instead, the Victoria Ward, Ltd. Defendants, by signing on to the Development Agreement for the Ward Neighborhood, affirmatively accepted and agreed to comply with the terms and conditions of the Master Plan Permit, including the requirement to address and incorporate Rail.

3. Under this very same Development Agreement, the Victoria Ward, Ltd. Defendants' development projects have thrived and derived tremendous profit from the HCDA's approval of numerous individual project developments.

4. The Victoria Ward, Ltd. Defendants have complied with the Master Plan Permit requirement to address and incorporate Rail as to individual projects it has developed under the Master Plan Permit, in particular: Ke Kilohana, A'ali'i and Ae'o have incorporated design accommodations for the rail project.

5. The Victoria Ward, Ltd. Defendants have also obtained a number of variances and modifications from their development permits through the HCDA in order to address Rail.

6. Not only has this Master Plan requirement to address and incorporate Rail been known to the Victoria Ward, Ltd. Defendants from the outset of their development plans, but this requirement has been adopted and complied with in the planning of all of their projects to date.

7. After entering the Master Plan Development Agreement with HCDA, and benefiting immensely from this agreement, and complying with the terms of this agreement for the entirety of its development activity in the Ward Neighborhood, as a matter of law, the Victoria Ward, Ltd. Defendants cannot now recover severance damages based on compliance with the terms and conditions of the agreement, which the Victoria Ward, Ltd. Defendants were legally obligated to do.

8. The Victoria Ward, Ltd. Defendants are prohibited from recovering severance damages on the basis of the burden imposed by HCDA pursuant to the Master Plan Permit requiring the Victoria Ward, Ltd. Defendants to address and incorporate Rail.

9. This ruling does not affect the Victoria Ward, Ltd. Defendants' constitutional right to recover just compensation for the value of the property interests HART is taking in this eminent domain action.

(Emphases added.)

### a.    The meaning of the Master Plan Permit is disputed

There is a genuine issue of material fact as to the meaning of the Master Plan Permit requirement that future rail plans be "addressed and incorporated," and there is a dispute as to the contemporaneous intentions of the parties.  A factfinder should have the opportunity to ascertain the parties' understanding of the phrase "addressed and incorporated" in light of the parties' representations and actions both at the time the Master Plan Permit was granted and after the fact.  Given the existence of a genuine dispute of material fact, the circuit court erred in granting the MPSJ, thereby depriving Victoria Ward of the opportunity to have the matter of severance damages decided by a jury.

Victoria Ward maintains that it never relinquished any rights to recover compensation, including for severance damages arising from the takings, and that no permitting document or ordinance mandated such.  HART, in contrast, asserts that by agreeing to the Master Plan Permit with the provision that a future rail network shall be "addressed and incorporated," Victoria Ward cannot subsequently seek severance damages for claimed impacts to Ward Village arising out of HART's acquisitions of property related to rail.

The record contains evidence indicating that key players within the HCDA, Victoria Ward, and HART disputed the

meaning and effect of the Master Plan Permit at various times throughout the permitting and construction process.

The HCDA's decisionmaking authority is vested in the HCDA Board of Directors ("HCDA Board"). HRS § 206E-3(b)(3) (2014). The declarations of several HCDA Board members, in which they set forth their respective understandings of the Master Plan Permit, individual permitting procedures, and the HCDA's general practices around permitting, raise a question of fact as to whether the Master Plan Permit required Victoria Ward to forgo compensation to which it would otherwise be entitled.

C. Scott Bradley served on the HCDA Board from 2006 — 2012, and as the Board Chairperson in 2011. Bradley noted that he did not understand the Master Plan Permit to have precluded Victoria Ward from collecting severance damages: "[t]he HCDA Board did not condition the master plan permit on any condition that Victoria Ward waive or agree to forego compensation to which it would otherwise be entitled due to construction of the rail project in and around Ward Village."

Steven J. Scott served on the HCDA Board from 2015 — 2016, during which time he reviewed several individual Ward Village building projects. Although Scott did not serve on the HCDA Board at the time the Master Plan Permit was granted, he stated generally, in relation to the question of whether Victoria Ward waived its right to compensation:

22

> I also do not think that HCDA expects or expected Victoria Ward . . . or any Howard Hughes company to waive compensation or damages owed because of the rail project. I do not recall any discussion at any time regarding such a waiver.
>
> . . .
>
> <u>Based on my experience, if HCDA wanted to impose a condition, like a dedication of land to the rail project, it would have stated it specifically and explicitly in the permits</u>.

(Emphasis added.)

Anthony J.H. Ching, the HCDA Executive Director from 2008 — 2015, supplied a Disclosure Report to provide both factual information and expert opinions, and a Rebuttal Report to rebut the Callies Report supplied by Victoria Ward. When deposed, Ching noted that no HCDA permits or applications constituted an agreement by Victoria Ward to disclaim its right to sue for severance damages:

> Q. Mr. Ching, [the Master Plan Permit] does not say anywhere that Victoria Ward would be waiving its damages claims in a subsequent eminent domain action, correct?
>
> . . .
>
> A. Again, without finding a legal opinion, it does — it would not appear so.
>
> . . .
>
> Q. [O]ut of all of the documents that you reviewed in connection with your either disclosure report or rebuttal report concerning Victoria Ward's individual plan development projects [including the permit applications, HCDA staff reports, and HCDA approval documents], none of those documents state that Victoria Ward waived or otherwise gave up any damages claims in this eminent domain action or in a future eminent domain action, correct?
>
> A. To the best of my recollection, yes.

Victoria Ward also contends that the Master Plan Permit was understood to mean that Victoria Ward would simply coordinate rail plans with HART and C&C officials.  This alternative interpretation of the "addressed and incorporated" language is supported by Victoria Ward's representations to HART prior to the litigation.  For example, in a 2015 letter to HART Executive Director Daniel Grabauskas, Victoria Ward stated: "Accordingly, prior to HART seeking to acquire any of the Subject Parcels . . . we request for HART to review the modifications proposed by our traffic engineering firm and to incorporate the modifications to address the previously identified impacts."  (Emphases added.)  Further, Deepak Neupane, the HCDA Executive Director from 2020 - 2022 and previous HCDA Director of Planning and Development from 2006 - 2019, clarified that the Master Plan Permit language simply meant "that the development will be coordinated with transit station locations and the route. . . .  [T]he thinking was that the C&C and the developer would, you know, coordinate each other's development plan."

Finally, neither the Master Plan Permit nor the Development Agreement explicitly states that Victoria Ward must forgo just compensation in the event of an eminent domain action by HART, nor do they explicitly require an exaction or dedication of property by Victoria Ward for a rail project.  The

absence of any such condition is striking, especially in light of the Master Plan Permit's otherwise explicit conditions. For example, the Master Plan Permit includes the requirement that a designated park space be "dedicated through a perpetual easement for public use gathering areas" and that Victoria Ward allot 245,638 of square feet for open space. Victoria Ward was also never required to make modifications to its Submittal to reflect a rail route and station within Ward Village.

In contrast to the above evidence supporting Victoria Ward's position that the Master Plan Permit does not preclude it from seeking severance damages, HART points to numerous statements in the Master Plan Permit Submittal and Development Agreement, as well as Victoria Ward's individual building permit applications, to argue that Victoria Ward understood that it would voluntarily — and without additional compensation beyond the benefits of the Master Plan Permit — accommodate rail. On their face, these statements acknowledge the rail route and Kaka'ako station location, the rail project's impact on Ward Village, and Victoria Ward's continued obligation to coordinate with HART. For example, the June 5, 2013 permit application for Ke Kilohana, located on Land Block 5, stated:

> This project will accommodate the Honolulu Rail Transit that cuts through a corner of the project site, and will address pedestrian flow from the rail transit station across Ward Avenue.
>
> . . .

25

This project is adjacent to the planned rapid transit guideway. Although the elevated transit rail does not necessarily produce more noise than the existing commercial activities, it elevates the noise contours higher by several floors. A higher platform will again provide needed buffer between the adjacent transit rail and the residential floors.

The permit application for 'A'ali'i, on Land Block 1, stated:

The HART rail guideway is proposed through the north portion of the site, and subsequently 'A'ali'i has been designed to accommodate the proposed HART guideway and required setbacks.

. . .

The construction plans and related requirements for the HART elevated rail system have been incorporated into the Ward [Master Plan] and specifically into the design of 'A'ali'i. As required by HART, the elevated guideway with three columns, impact the planning and use of 'A'ali'i, along the mauka boundary and Queen Street frontage. The impact to the planning of Land Block 1 has been significant with a substantial amount of acreage being isolated or encumbered by HART use.

The benefit of the planned transit station is that residents and visitors will have convenient access to rail. . . . All of the planned residential units within Land Block 1 are within a five-minute walk (1/4 mile) . . . of the Ward Station.

HART also points to the testimony of former HCDA Executive Director, Anthony Ching, who concluded:

The Master Plan Permit's requirements with respect to Rail obligated, and put the burden on, [Victoria Ward] to plan and design individual development projects within the Master Plan in a manner that accommodated and incorporated Rail. Indeed, the Master Plan provided [Victoria Ward] with great flexibility to do so. Conversely, it did not allow [Victoria Ward] to accommodate and incorporate Rail into its plans for Ward Village under the Master Plan and then, years later, seek damages from HART for doing so — that is not how a condition of approval for an entitlement works.

. . .

26

> It is my further opinion that, if [Victoria Ward] had advised the Authority on any given project permit application that [Victoria Ward] had not accommodated Rail or could only accommodate Rail at the cost of millions of dollars — which [Victoria Ward] would later seek from HART — that the Authority would have either rejected the permit application; or forced [Victoria Ward] to re-plan and/or redesign the project.

The above evidence reflects a genuine issue of material fact as to the meaning of the Master Plan Permit and whether the Permit precluded Victoria Ward from collecting severance damages for impacts to non-taken properties. Accordingly, a jury should have the opportunity to ascertain the parties' understanding of the Master Plan Permit.

### b. HART has not sufficiently established estoppel by acceptance

In addition to the Master Plan Permit's ambiguous meaning, there is a dispute of material fact as to whether Victoria Ward is precluded from seeking severance damages under an "estoppel by acceptance" theory. The principle of estoppel by acceptance is based in the notion that the acceptance of certain benefits may preclude a party from asserting — to another party's disadvantage — a right inconsistent with a position previously taken. We hold that there is a genuine dispute of material fact as to whether Victoria Ward adequately reserved the right to collect severance damages in exchange for the benefits arising from the Master Plan Permit and the accommodations of rail. Thus, Victoria Ward is not precluded as

a matter of law from seeking severance damages under an estoppel by acceptance theory.

HART is careful to specify that Victoria Ward did not waive its right to seek compensation, but that Victoria Ward "has no constitutional right to recover damages on the basis of having voluntarily complied with the terms of the 2009 Master Plan Permit, where [Victoria Ward] has reaped the benefits of doing so for over a decade."

HART repeatedly points to Victoria Ward's representations voluntarily welcoming rail and promising to "embrace" transit.  Noting the multitude of benefits derived from the Master Plan Permit — namely the greater building flexibility, preferential density allowances resulting from transit-oriented development, and the ability to collect billions of dollars in revenues through the sale of units made more valuable in part due to their proximity to rail — HART contends that Victoria Ward's severance damages claims are barred as a matter of law.  Under HART's theory, Victoria Ward should have challenged the Master Plan Permit prior to accepting the benefits derived from it.  Because Victoria Ward affirmatively accepted the benefits of the Permit, its subsequent claim for severance damages constitutes an inconsistent legal position.

However, Victoria Ward contests the notion that it voluntarily agreed to incorporate rail without seeking damages. Victoria Ward presents evidence showing that it protested the takings and reserved its right to seek compensation consistently over the course of a decade.

In a 2009 letter to the Honolulu Department of Transportation Services regarding a draft environmental impact statement, Victoria Ward's predecessor in interest, GGP, outlined a number of potential impacts from rail including the loss of parking, loss of buildings, and impacts to future development opportunities in Ward Village. The letter proposed alternate routes to reduce impacts on Ward Village and encourages the parties to work together "with respect to the methods of construction, the construction timeline, staging areas, utility relocation and related matters so that the impact upon our properties and the business conducted thereon is minimized to the greatest extent possible." The letter to the Department of Transportation Services concludes:

> We have not attempted to outline all of the effects that the proposed project will or may have upon our properties, both current and future uses, such as those envisioned in the recently approved Master Plan for the Ward properties. . . . We reserve all of our rights and remedies, at law and in equity, in connection with the [HART] project and its effects upon our properties and the businesses conducted therein.

(Emphasis added.)

29

In a 2014 letter to the former HART Executive Director Daniel Grabauskas, Victoria Ward reiterated its intention of working with HART to "ensure that the Kakaʻako Rail Station and the Rail Transit Project are designed in a harmonious manner with the Master Plan," and that:

> Victoria Ward, Limited, . . . is the owner of several parcels, either in fee or as the owner of one hundred percent (100%) of the beneficial interest under a recorded trust agreement, . . . that have been the subject of notices and communications from HART and its various contractors. [Victoria Ward] understands that HART seeks to acquire, through negotiated sale or its condemnation powers, some or all of the Subject Parcels as part of the Honolulu Rail Transit Project . . . and further intends to place a rail station (the "Kakaʻako Rail Station") on one of the Subject Parcels.
>
> As HART is no doubt aware, the Subject Parcels are subject to a Master Plan for high-density commercial and residential development and redevelopment. [Victoria Ward] will seek to be fully compensated for all property acquired or impaired as a result of this sale or condemnation, especially to the extent that a condemnation impacts [Victoria Ward]'s ability to develop and/or redevelop pursuant to the Master Plan. Independent of that concern, [Victoria Ward] believes that it may be possible for [Victoria Ward] and HART to mutually benefit from the cohesive integration of the Kakaʻako Rail Station and Rail Transit Project into the existing and planned developments pursuant to the Master Plan.

In a March 2015 letter to Grabauskas, Victoria Ward expressed concern over design plans which would "eliminat[e] several ingress and egress passageways." The letter proceeded to list the impacts on ingress and egress in greater detail, and concluded:

> Please allow this letter to serve as notice to HART that the above mentioned impacts are not acceptable to [Victoria Ward] and will cause significant damages to [Victoria Ward], including, but not limited to, damages related to or resulting from the reduced accessibility to the Subject Parcels for [Victoria Ward]'s current and future residents

and customers and for customers of [Victoria Ward]'s current and future tenants, and damages related to or resulting from HART's taking of portions of Block M where improvements are planned to be located. Accordingly, prior to HART seeking to acquire any of the Subject Parcels from [Victoria Ward], we request for HART to make alterations and modifications to its design of the Rail Transit Project to address the above referenced impacts and to respond to this letter with such modifications.

Victoria Ward consistently reserved its right to collect damages for impacts to its properties through letters to Grabauskas, all in response to various developments in HART's project. In an April 2015 letter, Victoria Ward stated:

> For all these reasons, and as stated in my last letter, <u>the above mentioned impacts are not acceptable to [Victoria Ward]</u> because they will cause significant problems to the general public traveling to and in Kaka'ako and to current and future residents in Kaka'ako. <u>In addition, the impacts will cause significant damages to [Victoria Ward]</u>, including, but not limited to, damages related to or resulting from the reduced accessibility to the Subject Parcels for [Victoria Ward]'s current and future residents and customers and for customers of [Victoria Ward]'s current and future tenants, and damages related to or resulting from HART's taking of portions of Block M where improvements are planned to be located. Accordingly, prior to HART seeking to acquire any of the Subject Parcels from [Victoria Ward], or any parcels in Kaka'ako, we request for HART to review the modifications proposed by our traffic engineering firm and to incorporate the modifications to address the previously identified impacts.

(Emphases added.)

In response to a Letter of Offer from HART to acquire portions of Ward Village property in November 2015, Victoria Ward contested HART's estimate of just compensation and noted:

> Victoria Ward is entitled to compensation not only for the value of the property that may be taken by HART, but also for all damages caused by HART's taking to the remaining property owned by Victoria Ward. . . . [T]he identified "Total Just Compensation" figure does not include, any severance or other damages that Victoria Ward will suffer by HART's taking and by the [HART rail project].

31

In response to a later Letter of Offer from HART, Victoria Ward's attorneys sent a letter in 2018 again reasserting Victoria Ward's right to collect severance damages:

> As you know, Victoria Ward is also entitled to compensation not only for the value of the property taken, but also for all damages caused by HART's takings to the remaining property.

The above-quoted statements are just a sample reflecting Victoria Ward's consistent opposition to HART's plans and are sufficient to raise a dispute of fact with regard to HART's motion for partial summary judgment premised on an estoppel by acceptance theory.

Because the meaning of the Master Plan Permit is in dispute and there is a dispute as to HART's estoppel by acceptance theory, we vacate the order granting HART's MPSJ No. 3.

3. **There is a genuine dispute of material fact as to the "stairwell claim," the "screening claim," and the "setback claim"**

HART's MPSJ No. 11 sought to preclude Victoria Ward from collecting damages in relation to structural modifications to buildings in Ward Village. In granting HART's MPSJ No. 11, the circuit court stated that the motion was granted "on the same grounds previously stated" in its order granting HART's MPSJ No. 3. In light of our holding vacating HART's MPSJ No. 3, and due to the multitude of factual disputes relating to HART's

MPSJ No. 11, we also vacate the order granting HART's MPSJ No. 11.

Of note, HART's MPSJ No. 11 specifically related to three components of Victoria Ward's severance damages claims: (1) the "stairwell claim," or the allegation that HART's actions forced Victoria Ward to enclose a stairwell in the Ke Kilohana tower resulting in a loss of approximately 10,000 square feet of developable floor area totaling $3 million in lost profits and $512,000.00 in direct costs to construct the enclosure itself; (2) the "screening claim," in which Victoria Ward alleges that HART required it to screen parking structures for the Ke Kilohana, 'A'ali'i, and Ae'o towers totaling $382,483.00 in damages; and (3) the "setback claim," which refers to Victoria Ward's assertion that it was required to push back the Ae'o tower eighteen feet from Queen Street, as opposed to the ordinary fifteen-foot setback requirement, resulting in a loss of 1,181 square feet of commercial space, totaling $484,000.00 in damages from lost development opportunities.

For all three of these claims, HART argues that Victoria Ward failed to establish a causal link between the claimed damages and a demand by HART to make the modifications. HART claims that Victoria Ward made the specific modifications "for its own design reasons" and that because "[Victoria Ward] cannot prove that HART caused any of the alleged damages related

33

to the Stairwell Claim, the Screening Claim, or the Setback Claim," Victoria Ward failed to satisfy its burden of proof.

The evidence presented by both parties is in large part ambiguous and circumstantial, requiring a factfinder to weigh credibility and evaluate many separate pieces of evidence. In sum, there is a genuine dispute of material fact that should be presented to a jury.

In the "stairwell claim," Victoria Ward and HART dispute the precise qualities of the stairwell enclosure that HART would have accepted in light of their safety concerns. HART asserts that an "open stairwell with mesh, screening, or something similar" would have accomplished the safety objectives without reducing developable space. HART cites to the deposition testimony of In-Tae Lee, an engineering director for HART, who implied that HART's safety concerns could have been allayed through less costly means:

> Q. And HART suggested that that stairwell be enclosed instead of open to avoid that safety risk, correct?
>
> A. I'm not sure of that. I thought it -- as long as it prevented objects from being thrown off, that would satisfy HART.

Instead of proving that Victoria Ward was obligated to build a solid, fully-encompassing enclosure, HART asserts that Victoria Ward's evidence instead simply shows that HART expressed concern about objects being thrown from the stairs, but that a simpler mesh screen or fence would have sufficed in

both allaying HART's concerns and preserving Victoria Ward's plans for an exterior staircase that would prevent Victoria Ward from having to cut down on developable square footage space.

Victoria Ward, in contrast, presents the statements of numerous architects and other witnesses with personal knowledge who attest that HART's expressed concerns necessitated the design of a stairwell enclosure.  Thus, the "stairwell claim" involves a disputed issue of material fact.

As to the "screening claim," Victoria Ward cites to more testimony, declarations, and HART communications establishing that parking structures were screened due to HART's concern that objects would be thrown onto the rail guideway.  In contrast, to support HART's assertion that the screenings contribute to aesthetic or other functional purposes, HART presented evidence that all four sides of the parking structures are screened (rather than solely the rail-facing sides). Viewing all evidence in the light most favorable to Victoria Ward, there is a genuine issue of material fact as to the impetus giving rise to the screening claim.

Finally, with regard to the "setback claim," Victoria Ward presented evidence that the additional setback along Queen Street was to allow additional room for "HART's rail guideway and 10-foot safety and maintenance buffer, placement of utility infrastructure next to the Ae'o building, and associated road-

widening to accommodate HART's placement of columns in Queen Street." This evidence included communications by both Victoria Ward and HART referring to proposed building plans and concerns that rail could conflict with construction in Ward Village. This evidence is sufficient to raise a genuine issue of material fact.

In light of the admissible evidence, the circuit court erred in granting HART's MPSJ No. 11. There is a dispute of fact as to whether the modifications and re-designs were undertaken due to requirements imposed by HART, or to satisfy Victoria Ward's extraneous preferences. Accordingly, this court vacates the order granting HART's MPSJ No. 11 and remands for further proceedings consistent with this opinion.

**4.    The circuit court did not err in granting HART's MPSJ No. 2 or Victoria Ward's MPSJ No. 1**

The circuit court order granting HART's MPSJ No. 2 specified that the Master Plan Permit required Victoria Ward to affirmatively accommodate and incorporate rail in the planning and design of its Ward Village projects. The order did not specify the contours of this obligation, nor did it explicitly preserve or deny Victoria Ward's right to seek severance damages.

In light of the above discussion and holdings, the order granting HART's MPSJ No. 2 is affirmed. Victoria Ward was

required to address and incorporate rail, but the nature of this obligation is to be determined by a jury. We also affirm the order granting Victoria Ward's MPSJ No. 1, which simply held that Victoria Ward did not waive or forfeit its constitutional right to just compensation.

**B.    The Circuit Court Erred in Granting HART's MPSJ Nos. 5 and 9 Relating to the Lost Tower**

Victoria Ward asserts that, in the absence of rail, it could have built a sixth tower on Land Block 1 (the "Lost Tower" claim). The circuit court ruled that Victoria Ward is prohibited from arguing in favor of an award of compensation for the loss of a supposed 400-foot luxury Lost Tower, and for the relocation of units from the Lost Tower to less valuable or less efficient locations around the parking podiums of existing buildings within Ward Village (the "podium units" claim). The Lost Tower claim and related podium units claim comprise a significant portion of Victoria Ward's total damages sought.

In its order granting HART'S MPSJ No. 5, the circuit court ruled that "evidence of [the Lost Tower] would be speculative and unduly confusing" to a jury. The circuit court also noted that the ruling overlaps with its ruling on HART's MPSJ No. 3 which prohibited Victoria Ward from recovering severance damages on the basis of the Master Plan Permit.

37

In its order granting HART'S MPSJ No. 9, the circuit court ruled that it would prohibit Victoria Ward from seeking severance damages for the relocation of "Lost Tower" units to less valuable and less efficient "podium units" — or residential real estate surrounding parking podiums — largely based on its rulings in relation to HART's MPSJ Nos. 1, 2, 3, and 5.

The circuit court erred in granting HART's MPSJ Nos. 5 and 9. The circuit court's decisions were based on its conclusion that Victoria Ward's claim for just compensation arising from the inability to develop a sixth tower on Land Block 1 would be "overly speculative" and confusing to a jury. However, Victoria Ward has presented sufficient evidence to withstand summary judgment. Accordingly, we vacate the circuit court orders granting HART's MPSJ Nos. 5 and 9 and remand to the circuit court in order to allow Victoria Ward to present to a jury its claims for severance damages relating to the Lost Tower and podium units.

1. **The Lost Tower and HART's MPSJ No. 5**

HART seeks to preclude Victoria Ward from arguing for including the "Lost Tower" — a 400-foot luxury condominium tower that Victoria Ward purportedly planned to build on the site of the Kakaʻako Station — in its appraisal of Land Block 1, on the grounds that the Lost Tower is too speculative and part of an "ex post facto development scheme, admittedly reverse engineered

38

by [Victoria Ward] and its expert witnesses" to increase the overall damages figure.

The Lost Tower claim centers on a dispute over how to calculate the "highest and best use" of Land Block 1. Eminent domain proceedings are intended to award landowners "an amount of just compensation which as nearly as possible approximates the value which a free market would attach to the taken property." City & Cnty. of Honolulu v. Market Place, Ltd., 55 Haw. 226, 242, 517 P.2d 7, 19 (1973). A standard valuation method in eminent domain cases calculates just compensation as the difference between the fair market value of condemned property immediately before the taking (i.e., the condition unaffected by the taking) and the fair market value of the remaining property after the taking. Territory v. Adelmeyer, 45 Haw. 144, 149, 363 P.2d 979, 983 (1961). The fair market value of the property in both the "before" and "after" conditions is calculated by estimating the highest and best use, defined as the use of property "that will generate the most profit." Highest and Best Use, Black's Law Dictionary (11th ed. 2019). "The highest and best use of a property is the one that is physically possible, legally permissible, financially feasible, and maximally productive." Menard Inc. v. Cnty. of Clay, 886 N.W.2d 804, 811 (Minn. 2016); see also Twp. Of Manalapan v. Gentile, 231 A.3d 631, 637 (N.J. 2020) ("To constitute the

'highest and best use,' a use must be '1) legally permissible, 2) physically possible, 3) financially feasible, and 4) maximally productive.'").

HART argues that there was never a realistic plan to build a sixth tower on Land Block 1, and that the Lost Tower claim is "reverse engineered."  Victoria Ward did not submit any applications, specific plans, or detailed designs of a 400-foot "Lost Tower" on Land Block 1.  Even if a plan existed, HART claims, it would not have been legally permissible since it would conflict with the construction of the Kaka'ako Station and thus violate the Master Plan Permit obligation to address and incorporate rail.  Because the highest and best use of property in both the "before" and "after" conditions must be legally permissible, and because the Lost Tower conflicts with the Master Plan Permit, HART concludes that Victoria Ward must be prohibited from seeking severance damages related to the "Lost Tower."

HART points to the 2008 Master Plan Submittal which only depicts a 240-foot tall residential mid-rise/office building on the site of the Kaka'ako Station, rather than a 400-foot luxury residential tower.  According to the Submittal, a majority of buildings surrounding the Lost Tower were planned to be residential mid-rise/office structures.  Thus, not only did Victoria Ward's sole relevant submission to the HCDA represent a

building on Land Block 1 directly contradicting Victoria Ward's description of the Lost Tower, but further, the pattern of development surrounding the site of the alleged Lost Tower conflicts with Victoria Ward's alleged Lost Tower plans.

Victoria Ward responds that, under the Master Plan Permit, it had the right to develop Land Block 1 with six condominium towers. Consequently, the highest and best use of Land Block 1 in the "before" condition consists of the five towers already slated to be built, plus the Lost Tower. Land Block 1 is less valuable in the "after" condition, because the Kaka'ako Station prevents construction of a sixth tower on Land Block 1.

Victoria Ward notes that the Master Plan Submittal reflects a Ward Village building — though not a 400-foot tall luxury condominium tower — precisely on the spot where the Kaka'ako Station is now planned to be built. This preliminary plan indicates that Victoria Ward had planned to build some structure on the site of the Kaka'ako Station.

Victoria Ward presents additional evidence in favor of its Lost Tower claim. First, Howard Hughes's then-Senior Vice President of Development, Race Randle, submitted sworn declarations stating that the highest and best use of the land without HART's taking would be to construct a residential tower:

> If Victoria Ward was not prevented from developing the planned tower at the Kaka'ako Station location and guideway because of HART's taking [o]f this land, in its highest and best use it would be constructed as a "luxury" or "upper" tier condominium tower, similar to Ae'o, 'A'ali'i, Ko'ula, and Anaha towers.

In another declaration, Randle asserted that the Lost Tower "could have been the same height as Ae'o and 'A'ali'i or up to approximately 400 feet." Randle separately testified that Land Block 1 is uniquely valuable because it rests in "the heart of the neighborhood," surrounded by amenities.

Victoria Ward also points to testimony from experts on both sides of this case stating that the highest and best use of the land without the taking would be to build a sixth tower on Land Block 1, and that the Lost Tower could exist but for the Kaka'ako Station. Two of Victoria Ward's expert appraisers concluded that the before condition entails six towers on Land Block 1. Even HART's expert appraiser recognized that, in the "before" condition without rail, Victoria Ward could have built six towers on Land Block 1:

> Q. [ ] I'm talking before condition without rail, okay, the without-rail scenario. Do you have six towers on Land Block 1?
>
> . . .
>
> A. [ ] If you're asking me in the before condition was there potential to build six towers on Land Block 1 in the before condition, the answer is yes.
>
> Q. [ ] Okay. And does your before condition assume that?
>
> A. My before condition assumes that the developer would do what [Victoria Ward] . . . has done from the beginning, which was to continue to scope the — the market, adjust,

and react to the market and the regulatory environment as they moved forward.

. . .

Q. Well, do you have a before condition that has six towers on Land Block 1 or not?

. . .

A. I have a before condition that has a certain amount of square footage — buildable square footage available on Land Block 1, <u>recognizing that there was an opportunity to have used that square footage in a variety of ways, including six towers, if desired</u>.

(Emphasis added.)

Another HART expert submitted a report reflecting scenarios with six towers on Land Block 1 without rail and confirmed the physical feasibility of this scenario as the "before" condition.  Although the experts disagree as to the precise value of damages owed to Victoria Ward as a result, Victoria Ward correctly states that "[t]his is a classic battle of the experts for the jury to consider."

The circuit court agreed with HART and granted its motion for partial summary judgment.  In its order, the circuit court specifically noted that Victoria Ward lacked any design plans or permits for the purported Lost Tower:

> 3.  Given the stakes, that the Victoria Ward, Ltd. Defendants are saying that the taking was of this parcel of land where they intended to build such a tower, <u>it would seem that the first thing the Victoria Ward, Ltd. Defendants would have provided to the Court would have been plans, drawings, at least conceptual design, as to what type of development this would have been.  The Victoria Ward, Ltd. Defendants never took any material steps in the development of this alleged lost tower</u>.  Based on Race Randle's [HRCP Rule] 30(b)(6) deposition testimony, it appears that the Victoria Ward, Ltd. Defendants believed

43

> such efforts would be futile in light of the Master Plan
> requirement to address and incorporate rail.  As such, it
> would appear that the so-called "lost tower" was in fact a
> tower that never existed.

(Emphasis added.)

We review the circuit court's order granting partial summary judgment de novo, contrary to HART's suggestion that this appeal consists of an evidentiary matter that should be reviewed under the abuse of discretion standard.

### a.   There is a genuine dispute of fact as to whether Victoria Ward presents a reasonable argument for a probable future use

A property's highest and best use is often hypothetical, because even prospective uses of a property may affect its value on the open market.  Thus, a party may — within certain limits — offer a proposed or hypothetical development plan to demonstrate the likelihood of market demand for the property and, accordingly, its value.  Market Place, 55 Haw. at 243, 517 P.2d at 19 — 20 ("[O]nce a reasonable argument is made for a probable use, . . . competent evidence tending to show the value of that use should be admitted." (quotation, citation, and ellipsis omitted)); Adelmeyer, 45 Haw. at 147—48, 363 P.2d at 982.

This calculation method, and specifically the process of deriving a value for the hypothetical "before" condition, may involve some speculation and a "clash of rival experts." Adelmeyer, 45 Haw. at 163, 363 P.2d at 989.  This court has

clarified that the highest and best use need not be "'the use at the time of taking'" or even "'the zoning at the time of taking[.]'" State v. Pioneer Mill Co., Ltd., 64 Haw. 168, 178, 637 P.2d 1131, 1138 (1981) (quoting State v. Midkiff, 55 Haw. 190, 193, 516 P.2d 1250, 1253 (1973)). Rather, a condemnee like Victoria Ward is permitted to "advance any reasonable argument for a probable future use" when calculating just compensation for a taking. Id. at 178, 637 P.2d at 1138 – 39 (emphasis added); see Nichols, Eminent Domain, § 18.05[3] ("The owner may introduce evidence of the highest and best prospective use even though such owner has no plans to sell the property or utilize it for that use. The prospective use will not be admissible, however, if the asserted use

. . . depends on a [zoning] variance which legally cannot be granted.").

In Adelmeyer, we set a relatively low threshold before a landowner can present evidence of a putative highest and best use to a jury: "[a]ny competent evidence of matters, not merely speculative, which would be considered by a prospective vendor or purchaser or which tend to enhance or depreciate the value of the property taken is admissible. . . . The only question, then, is one of competence of the witnesses and their testimony." 45 Haw. at 147—48, 363 P.2d at 982 (emphasis added) (citation omitted). If there is then a conflict "as to

45

the highest and best use of the property, the question is properly one left to the jury." State v. Dillingham Corp., 60 Haw. 393, 408, 591 P.2d 1049, 1058 (1979) (quoting Alabama Power Co. v. Hamilton, 342 So.2d 8 (Ala. 1977). Thus, the proffered uses that should be excluded from jury consideration are those that are illegal, illogical, physically or financially unfeasible, or otherwise so remote or improbable as to not figure materially in the considerations of the hypothetical willing buyer and seller.

Adelmeyer, Market Place, and subsequent cases establish that a use asserted by a condemnee may be presented to a jury even if the asserted use is hypothetical and disputed. Contrary to the circuit court's reasoning, the existence of development plans is not a necessary condition, and the relevant question for the circuit court was whether a sixth tower on Land Block 1 was reasonably probable such that a hypothetical willing buyer would consider it when negotiating the sale of the property. See Market Place, 55 Haw. at 242—43, 517 P.2d at 19— 20. In fact, concrete development plans are often irrelevant to establishing market value, since the inquiry into the highest and best use considers all feasible uses. Rather, the highest and best use may be established through expert testimony and studies regarding the feasibility of prospective future uses.

Taking the evidence, as set forth above, in the light most favorable to Victoria Ward, there is a genuine dispute of material fact as to whether Victoria Ward presented a "reasonable argument for a probable future use[.]"  Pioneer Mill, 64 Haw. at 178, 637 P.2d at 1139.  Thus, the circuit court erred in depriving Victoria Ward of an opportunity to present this fact-intensive question to a jury.

> **b.  HART cannot limit damages to the difference in value of two "after" conditions**

It is critical in eminent domain disputes that courts accurately conceptualize the "before" condition without the government taking.  This court has clarified that condemnors may not force condemnees to compare two "after" conditions:

> A major goal of the valuation process in eminent domain proceedings is to determine market conditions for the taken property as though no condemnation had ever been contemplated. . . . [T]he condemnor may not bootstrap itself to a lower value for taken property by showing that the very act of taking itself and the preparations therefor[e] adversely affected market conditions, thereby lowering fair market value or eliminating a reasonably probable use.

Market Place, 55 Haw. at 246—47, 517 P.2d at 22 (emphasis added) (citations and internal quotation marks omitted).

Hawai'i caselaw goes to great lengths to clarify that property in the before condition must be completely detached from the government taking.  See id. By presupposing that Victoria Ward could never build the "Lost Tower" pursuant to the

Master Plan Permit, HART obscures the distinction between the before and after conditions.

HART claims that both parties agree that the highest and best use of the property is to implement the Master Plan Permit. And because the Master Plan Permit contains the requirement to incorporate rail, HART concludes that the before condition cannot omit the inclusion of the rail guideway and Kaka'ako Station. However, this leads us back to a critical dispute of fact — the meaning of the Master Plan Permit.

This dispute over Victoria Ward's right, or lack thereof, to build the Lost Tower is one that depends in part on determining the significance of the Master Plan Permit's provision that a future rail network would be "addressed and incorporated." It is possible that a jury would find that the Permit definitively caused any Lost Tower plans to be legally impermissible. In other words, Victoria Ward was on notice that it could not develop Land Block 1 with six condominium towers. In that case, Victoria Ward would not be able to recover damages related to the Lost Tower, as the building would be a legal impossibility. However, it would be erroneous for the court to compare two after conditions (i.e., two conditions with rail) and Victoria Ward's failure to produce detailed plans or renderings of a "Lost Tower" is not itself dispositive or a sufficient basis on which to grant partial summary judgment.

48

For the foregoing reasons, we vacate the order granting HART's MPSJ No. 5.

## 2. Relocation to Podium Units

Victoria Ward alleges that because it was prevented from building the Lost Tower, it was subsequently forced to relocate approximately 285,000 square feet of residential floor area from the Lost Tower to less efficient and less valuable parking podiums on Land Block 1 and Land Block 5.[4]

HART contends that Victoria Ward was motivated to build mixed residential-parking podiums for reasons entirely separate from re-locating residential units from the alleged Lost Tower. Specifically, HART claims that Victoria Ward built the mixed-use podiums "to create a more active, inviting streetscape that is more pedestrian-oriented and aesthetically pleasing, and to respond to demonstrated market demand for such units — reasons that have nothing to do with Rail or any Lost

---

[4] Here, "parking podiums" refer to mixed-use structures that integrate parking, residential, and commercial units. Specifically, parking podiums are lined by commercial and/or residential units facing outward to the surrounding streets and which hide the parking structure. Podiums are typically shorter in height than towers, and podium roofs often house amenities like pools and recreational space.

In the context of floor area, "efficiency" is a function of converting gross square footage to "saleable net square footage." Victoria Ward's appraiser concludes that towers are more than 70% efficient in generating net saleable area, compared to the 55-65% efficiency of podiums. Race Randle, Howard Hughes's former Senior Vice President of Development, clarified that podiums are less efficient because, among other reasons, hallways serve homes on a single side of the hallway (i.e., units facing outward to the street) whereas tower hallways constitute "shared gross floor area" serving units on each side of the hallway.

Tower." HART also argues that Victoria Ward's mixed-use concept for the parking podiums had existed from the initiation of the development of Ward Village, and that the use of podiums for housing was reflected in both the Master Plan Permit and Honolulu's Complete Streets policy which encourages the development of accessible, multi-modal, and habitable streets that enhance community interaction, sustainability, and safety.

Citing a lack of causal effect between HART planning the Kaka'ako Station on Land Block 1 and Victoria Ward building mixed residential-parking podiums, HART claims that the rail project had no impact on Victoria Ward's decision to place residential units in the parking podiums of 'A'ali'i, Ko'ula, and The Park, and that Victoria Ward's decision was instead motivated by design and community planning reasons.

HART points to numerous statements in the record in which several of Victoria Ward's experts suggested that podiums may have been built for aesthetic and multi-functional purposes beyond simply housing units from the Lost Tower. HART also refers to Victoria Ward's permit applications in which Victoria Ward refers to the potential of parking podiums to "move parking uses up and away from the street, thereby improving the street environment" and "provide additional open space, and create street-level retail space that will enhance the walkability of the neighborhood." HART further presents statements by Victoria

Ward executives lauding the aesthetics of parking podiums relative to bare parking structures.

Although HART presents evidence of alternative motives driving Victoria Ward's decision to build residential units within parking podiums, Victoria Ward introduced sufficient evidence to create a factual dispute as to whether the rail project was the cause.

Victoria Ward was not required to build residential units in podiums. Further, Race Randle's testimony indicates that Victoria Ward built podium units to house residential units that could no longer be built on Land Block 1. Randle stated in a deposition:

> Q. [I]f [Victoria Ward] could have built all of that 7.6 million square feet of residential [floor area] by adding a tower at the Kaka['ako Station and guideway location without using podium residential [floor area], that's how it would have proceeded; is that correct?
>
> A. That would have been our preference, yes.

In response to a question by HART asking whether Victoria Ward had "lost the ability to transfer the 'lost' floor area off Land Block 1 and construct it on another, comparable parcel," Randle responded: "[Victoria Ward] does not believe there is a comparable parcel." (Emphasis omitted.) Randle further stated in a deposition that "[r]esidential development in the podiums is less efficient and less valuable, or less desirable . . . than residential space in the tower," and that,

when compared to towers, "the cost per net square foot is much higher, because [podiums are] a lower efficiency product."

One of Victoria Ward's expert appraisers, Michael Waldron, stated during his deposition:

> [Q:] Did you reach an opinion that absent the project [Victoria Ward] would have built zero residential units in podiums [within Land Block 1?]
>
> . . .
>
> [Waldron:] Yes, that is my opinion. Conceptually, in the highest and best use in the before condition.

Contrary to HART's assertion that the evidence here is "undisputed," there is a clear dispute as to causality: Victoria Ward asserts that, in the "after" condition with rail, it had to re-locate units to parking podiums. HART counters that Victoria Ward cannot prove that the impetus for locating residential units within podiums was the loss of area on Land Block 1 for a supposed sixth tower. Drawing all reasonable inferences in favor of Victoria Ward, it has presented sufficient evidence to raise a question of fact as to whether it was forced to relocate units from the Lost Tower to less valuable podiums. This question should be presented to a jury, and we accordingly vacate the order granting HART's MPSJ No. 9.

### 3. Motion to strike J. Douglas Ing's Declaration

HART cross-appealed a circuit court order denying HART's motion to strike J. Douglas Ing's declaration. The declaration was submitted by Victoria Ward in its opposition to

HART's MPSJ No. 9. This court lacks jurisdiction to review HART's cross-appeal.

As Victoria Ward points out, the circuit court's order granting leave for the parties to file interlocutory appeals specified that (1) parties could appeal "the orders granting the Motions for Partial Summary Judgment," and (2) HART could cross-appeal "any of the adverse rulings on the Motions for Partial Summary Judgment," which were "the orders granting the Victoria Ward Defendants' Motions for Partial Summary Judgment Nos. 1, 2, 3, and 4."

"We cannot disregard a jurisdictional defect in an appeal and are required to dismiss an appeal on our own motion when we conclude that we lack jurisdiction." Wylly v. First Hawaiian Bank, 57 Haw. 61, 62, 549 P.2d 477, 479 (1976) (per curiam). We therefore dismiss on our own motion HART's cross-appeal of the circuit court's denial of its motion to strike.

## C. Victoria Ward Can Only Use the Replacement Cost or Cost to Cure Valuation Method if it Does Not Exceed the Diminution in Value from Lost Parking

Victoria Ward seeks compensation for the cost of building a new parking structure to house parking spots that might be lost due to the rail construction, and to satisfy the increased parking demand from the presence of the rail station in Ward Village. Victoria Ward's parking expert estimated that several hundred on-street and off-street parking spaces would be

53

lost in the area surrounding the Kaka'ako Station, with a "reasonable probability of adverse effects and substantial impairment on the remaining parking supplies in the area."

In its MPSJ No. 7, HART sought to prevent Victoria Ward from pursuing its lost parking claim. Unlike some of the other summary judgment motions on appeal, the order granting HART's MPSJ No. 7 did not outright prohibit Victoria Ward from seeking severance damages. Instead, the circuit court simply narrowed the breadth of available valuation methods, which is within the court's authority in eminent domain cases.

Victoria Ward's preference would be to value its damages at the "replacement cost." This valuation method is also referred to in this appeal as the "cost to cure." Under this approach, Victoria Ward would be entitled to damages equal to the cost of ameliorating the effects of the taking (i.e., the cost of building replacement parking spots).

In contrast, HART convinced the circuit court to impose a traditionally used methodology for calculating damages in partial takings cases like this one. The circuit court ruled that Victoria Ward's damages may be valued at the replacement cost (or cost to cure) only if that value is less than the diminution in fair market value of the property between the "before" condition (no loss of parking) and the "after" condition. Thus, Victoria Ward may still recover the

54

replacement cost associated with parking, but only after making the requisite showing.

The circuit court's analysis was correct. In partial takings cases, if the cost to restore the untaken property to a pre-taking condition exceeds the difference in property value between the before and after conditions, then the condemnee is entitled only to the difference in value. See Territory v. Honolulu Plantation Co., 34 Haw. 859, 867 (Haw. Terr. 1939). This methodology ensures that courts balance the goal of making landowners whole for a taking with the practicality of ensuring that a condemnee does not receive an undue windfall as a result of a taking. See City & Cnty. of Honolulu v. Bonded Inv. Co., Ltd., 54 Haw. 385, 394, 507 P.2d 1084, 1091 (1973) ("To award [the] condemnee less than the value of the property taken would be unjust to him; to award him more than its value would be unjust to the public.") (parentheses omitted) (quoting Garrow v. United States, 131 F.2d 724, 726 (5th Cir. 1942)). This methodology also enforces condemnees' duty to mitigate damages.

We have previously restricted just compensation as the circuit court did here. See City & Cnty. of Honolulu v. Collins, 42 Haw. 199, 217 (Haw. Terr. 1957) ("Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined."). While it is the province of the jury to assess damages, it is the

province of the court to guide the jury as it does so.  See
Silva v. Souza, 14 Haw. 46, 48 (Haw. Terr. 1902) ("It is the
province of the jury to assess the damages according to the rule
of law, which it is the province of the court to lay down for
their guidance.") (Emphasis added.)

Evidence of the cost to cure "is admissible only when
the cost to cure is no greater than the diminution in value of
the remainder if the condition is left uncured."  4A Nichols,
Eminent Domain, § 14A.04[2][a].  The order did not absolutely
preclude Victoria Ward's favored valuation methodology — it only
imposed a precondition on its use.  That condition was intended
to achieve a guiding purpose of eminent domain law: to ensure
that landowners are "put in as good [a] position pecuniarily as
[they] would have occupied if [their] property had not been
taken."  United States v. Miller, 317 U.S. 369, 373 (1943).
Here, the circuit court, in an effort to balance the need to
make Victoria Ward whole with the risk of an undue windfall,
applied a limiting principle restricting Victoria Ward's favored
methodology to instances in which its use would not result in
unwarranted gain contrary to the guiding principles of eminent
domain law.

Victoria Ward's claims for severance damages
concerning lost parking presents a triable factual issue, and
the circuit court explicitly preserved Victoria Ward's right to

56

seek such severance damages.  The circuit court acted within its authority in imposing a precondition on Victoria Ward's preferred methodology because this action was consistent with the applicable legal principles..

For the foregoing reasons, we affirm the circuit court's order granting HART's MPSJ No. 7.  As for Victoria Ward's request to be given an opportunity to prepare another appraisal in response to this holding, Victoria Ward should direct this request to the circuit court on remand.

**D.   Victoria Ward Can Collect Severance Damages for Alleged Damages to Land Block 3**

The order granting HART's MPSJ No. 10 precluded Victoria Ward from seeking severance damages related to Land Block 3.  This issue  centers on the effect of the following phrase, found in parties' 2020 Joint Stipulation : "[b]oth parties will appraise Land Block 3 as a distinct larger parcel."[5]

---

[5]     The 7/23/2020 Joint Stipulation states, in relevant part:

> 4.   Exception as specifically provided below, the Parties will conduct their appraisals based on the following:
> . . .
>    c.  Victoria Ward contends that a compensable taking and/or compensable damages have occurred from Land Block 3; Plaintiff disputes that contention (as described in more detail in paragraph 5 below).
> . . .
> 5.   The parties do not agree about whether there is a compensable taking and/or compensable damages on Land Block 3. <u>Both Parties will appraise Land Block 3 as a distinct larger parcel</u>, including analyzing severance damages if any, and special benefits if any, subject to the following:
>    a. Plaintiff reserves all arguments that there is no compensable taking and/or damages to Land Block 3 and/or that Victoria Ward is not otherwise entitled to compensation related

The parties agree that HART's partial physical taking extends to Land Blocks 1 and 5.

Victoria Ward's severance damages claims concerning Land Block 3 include parking loss, ingress and egress loss resulting from the loss of a left turn, and ten years of construction and noise. Because it is undisputed that HART did not execute any physical takings on Land Block 3, Victoria Ward's just compensation claim as to Land Block 3 only concerns severance damages.

HART argues that Victoria Ward cannot recover severance damages for impacts to Land Block 3, because (1) no physical takings were executed on Land Block 3 and (2) Land Block 3 is a distinct parcel to be appraised separately from the rest of Ward Village. In other words, Land Block 3 was not "taken or damaged," because all the physical takings took place elsewhere, and any real-world impacts to the property are discounted because the parties stipulated that Land Block 3 is to be appraised as a distinct parcel. HART is careful not to

---

to Land Block 3. Victoria Ward reserves all arguments to the contrary.
    b. If Plaintiff successfully establishes that Victoria Ward is entitled to compensation for Land Block 3 (or that the amount of compensable damages should be reduced), Plaintiff cannot offset any special benefits allegedly accruing on Land Block 3 against damages to other Land Blocks, including Land Block 1 or Land Block 5.

(Emphases added.)

characterize the Joint Stipulation as a waiver. Rather, HART emphasizes that there has been "no legally cognizable taking or compensable damaging as to Land Block 3."

The circuit court ruled in large part that because Land Block 3 constitutes a distinct larger parcel, and because HART did not take any property from Land Block 3, Victoria Ward could not recover "severance damages or under inverse condemnation" for damages related to Land Block 3. The circuit court relied both on a plain reading of the Joint Stipulation and the parties' subsequent conduct — specifically, Victoria Ward's statements in support of one of its motions for partial summary judgment.

We vacate the order granting HART's MPSJ No. 10. The circuit court erred in placing undue emphasis on an ambiguous phrase of the Joint Stipulation and misapplied Victoria Ward's statements made in a separate context.

In a partial taking, where the state condemns only a portion of the entire property, the state must pay the fair market value of taken property and severance damages for damage to the remainder. The right of property owners to recover severance damages for impacts to property is set forth in the state constitution and HRS §101-23. Haw. Const. art. I, § 20 ("Private property shall not be taken or damaged for public use without just compensation." (emphasis added)); HRS § 101-23

(1990) ("[D]amages which will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned, . . . shall also be assessed.").

The People of Hawai'i added the phrase "or damaged" to the Hawai'i Constitution in 1968 following the construction of the H-1 freeway to provide remedies for property owners whose property lost value or usefulness although no physical taking was executed. The Framers of the 1968 Constitution considered such effects as they relate to highway construction in adding the "or damaged" provision to the constitution. See 2 Proceedings of the Constitutional Convention of Hawai'i of 1968, at 27-31.

Shortly after the 1968 constitutional amendment was adopted, this court emphasized the importance of severance damages, stating:

> It was not until a constitutional amendment in 1968 that the words "or damaged" were included in [Article I § 18 of the Hawai'i Constitution].[6]
>
> . . .
>
> Prior to the [1968] amendment [adding the "or damaged" clause], only the owner of physically "taken" property was entitled to compensation in Hawai'i, and those whose property was merely consequentially "damaged" by the primary taking were without recourse. . . . The chief purpose in adding the "or damaged" clause to the Constitution was to remedy this situation.

Market Place, 55 Haw. at 230-31, 517 P.2d at 12-13.

---

6    The eminent domain provision is now Article I § 20.

Although the Joint Stipulation states that Land Block 3 constitutes a distinct larger parcel, and despite the fact that HART is not taking portions of Land Block 3, property owners are entitled to severance damages for impacts to non-taken properties.  Neither the Joint Stipulation's text nor the parties' subsequent conduct supports the circuit court's conclusion that there was no genuine dispute of material fact as to whether Victoria Ward can recover severance damages related to Land Block 3.

a.    **The Joint Stipulation's text**

The circuit court indicated that the "distinct larger parcel" phrase was a significant factor in its decisionmaking.  However, the Joint Stipulation text is ambiguous, and the accompanying text cuts in favor of Victoria Ward.

The Stipulation language immediately following the "distinct larger parcel" phrase states, "[b]oth Parties will appraise Land Block 3 as a distinct larger parcel, including analyzing severance damages if any, and special benefits if any, subject to the following."  Both parties agree in the Stipulation that there were no physical takings within Land Block 3.  This leaves open solely the possibility that Victoria Ward could recover severance damages on Land Block 3.  It makes little sense (1) for the parties to agree that no takings took place on Land Block 3, (2) for the parties to intend to sever

Land Block 3 from Ward Village in a manner that would preclude the collection of severance damages, and (3) for Victoria Ward to explicitly reserve the right to seek damages related to Land Block 3.  In fact, the Joint Stipulation's accompanying text would be rendered meaningless and absurd if its language were read to constitute a surrender of severance damages, only to then immediately refer to the appraisal of severance damages and offsetting special benefits.

The accompanying Joint Stipulation language does not constitute an explicit disavowal, but rather seems to have the opposite intention:

> Victoria Ward contends that a compensable taking and/or compensable damages have occurred from Land Block 3; Plaintiff disputes that contention . . . .
>
> The Parties do not agree about whether there is a compensable taking and/or compensable damages on Land Block 3 . . . .
>
> [HART] reserves all arguments that there is no compensable taking and/or damages to Land Block 3 and/or that Victoria Ward is not otherwise entitled to compensation related to Land Block 3.  Victoria Ward reserves all arguments to the contrary.

(Emphases added.)

In light of the quoted passages, which preserve Victoria Ward's ability to exercise its constitutional right to seek just compensation for impacts to Land Block 3, it was erroneous for the circuit court to treat one short and contradictory phrase in the Stipulation as dispositive of this question.

### b. The parties' subsequent actions

Stipulations bind the parties thereto, and courts use contract law principles to review them. See Provident Funding Assocs., L.P. v. Gardner, 149 Hawai'i 288, 297, 488 P.3d 1267, 1276 (2021). "[I]n the face of an ambiguity, 'the court's objective is to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety.'" Id. at 298, 488 P.3d at 1277 (emphasis and brackets omitted) (quoting Hawaiian Ass'n of Seventh-Day Adventists v. Wong, 130 Hawai'i 36, 45, 305 P.3d 452, 461 (2013). Here, there are both textual ambiguities, noted above, and a genuine dispute as to the parties' intentions and understandings of the Joint Stipulation.

The circuit court correctly sought to interpret the "distinct larger parcel" language by reviewing the parties' conduct. To do this, the court looked to Victoria Ward's arguments in favor of Victoria Ward's MPSJ No. 3 ("Victoria Ward]'s MPSJ No. 3"). Victoria Ward's MPSJ No. 3 concerned special benefits, or beneficial impacts from a taking that can be used to offset severance damages. Victoria Ward's MPSJ No. 3 is not to be confused with HART's MPSJ No. 3, which precluded Victoria Ward from seeking severance damages.

In the memorandum in support of Victoria Ward's MPSJ No. 3, Victoria Ward stated that "all claims as to Land Block 3 — including severance damages and offsetting special benefits

63

- must be assessed separate and apart from all other claims related to any other land blocks of Ward Village." (Internal quotation omitted.) Subsequently, in the order granting HART'S MPSJ No. 10, the circuit court cited this language as revealing Victoria Ward's intentions and understanding of the Stipulation:

> When the Court refers to how the parties have treated the stipulation, the Victoria Ward, Ltd. Defendants' argument in support of their Third Motion for Partial Summary Judgment: to Enforce the Parties' 7/23/20 Joint Stipulation [Dkt. 1710], which dealt with special benefits, included the statement that "because the parties have stipulated that Land Block 3 is a separate larger parcel, all claims as to Land Block 3 including severance damages and offsetting special benefits must be assessed separate and apart from all other claims related to any land blocks in Ward Village." Thus, the Court is looking at the wording of the stipulation and how the parties, including the Victoria Ward, Ltd. Defendants, have interpreted the stipulation.

It was erroneous for the circuit court to rely so heavily on Victoria Ward's statement in support of Victoria Ward's MPSJ No. 3 to interpret the Joint Stipulation language at issue in HART's MPSJ No. 10. The issues central to HART'S MPSJ No. 10 and Victoria Ward's MPSJ No. 3 are different. Victoria Ward's MPSJ No. 3 concerned whether future development rights could qualify as a special benefit. Paragraph 6 of the Joint Stipulation contains clear language indicating that future development rights do not count as a special benefit in relation to Land Block 3. Furthermore, HART'S MPSJ No. 10 and Victoria Ward's MPSJ No. 3 concern different provisions of the Joint Stipulation. Victoria Ward's statements in support of Victoria Ward's MPSJ No. 3 do not clearly reflect a position in relation

64

to HART'S MPSJ No. 10.  HART'S MPSJ No. 10 concerns the application of Paragraph 5 of the Joint Stipulation.  The statements made by Victoria Ward in favor of Victoria Ward's MPSJ No. 3 have minimal value toward interpreting Paragraph 5 of the Joint Stipulation, because there is an explicit provision applicable to the dispute in Victoria Ward's MPSJ No. 3 (i.e., whether special benefits to Land Block 3 could offset damages on other land blocks):

> If Plaintiff successfully establishes that Victoria Ward is not entitled to compensation for Land Block 3 (or that the amount of compensable damages should be reduced), Plaintiff cannot offset any special benefits allegedly accruing on Land Block 3 against damages to other Land Blocks, including Land Block 1 or Land Block 5.

The Joint Stipulation language is silent on damages, but clear and specific to the question at the heart of Victoria Ward's MPSJ No. 3: whether HART could apply special benefits from Land Block 3 (where there was no physical taking) to offset damages arising from takings on Land Blocks 1 and 5.  The issue in Victoria Ward's MPSJ No. 3 contrasts with the dispute in this appeal, where Victoria Ward seeks to preserve its right to seek severance damages <u>to</u> Land Block 3 <u>from</u> Land Blocks 1 and 5.  The Joint Stipulation is not clear with regard to the latter issue.

Accordingly, the circuit court erred in (1) relying on the Stipulation's ambiguous text; then (2) buttressing its interpretation of the text by reference to Victoria Ward's subsequent pleadings, which were specific to a separate question

65

that was addressed explicitly by a different passage of the Stipulation.

### c.   The circuit court should review the factual questions on remand

Rather than relying on an ambiguous phrase or Victoria Ward's actions in relation to a separate provision of the Joint Stipulation, the circuit court should, on remand, allow a jury to determine whether Land Block 3 and the affected parcels of land are sufficiently united via application of the "three unities" test.  See Cnty. of Kaua'i v. Hanalei River Holdings Ltd., 139 Hawai'i 511, 520-23, 394 P.3d 741, 750-53 (2017).

Hawai'i law is clear that a landowner does not necessarily need to have suffered a physical taking in order to claim severance damages to a parcel of land.  Haw. Const. art. I, § 20; Market Place, 55 Haw. at 230—31, 517 P.2d at 12—13. Under the three unities test, a landowner like Victoria Ward may recover for damages to separate and independent tracts of land, like Land Block 3, provided that the landowner establishes the following factors shared between the condemned and remaining parcels of land: (1) unity of title, (2) physical unity, and (3) unity of use.  City & Cnty. of Honolulu v. Bonded Inv. Co. Ltd., 54 Haw. 523, 525, 511 P.2d 163, 165 (1973); Hanalei River Holdings, 139 Hawai'i at 521, 394 P.3d at 751.  No single factor is dispositive of a condemnee's claim for severance damages, and

the Joint Stipulation designating Land Block 3 as a "distinct" or physically separate parcel does not preclude Victoria Ward from collecting severance damages on Land Block 3.

The aforementioned analysis requires a factfinder to evaluate and weigh many separate pieces of evidence. Accordingly, this question is properly reserved for a jury. For the foregoing reasons, we vacate the order granting HART's MPSJ No. 10 and remand for trial.

**E.    Victoria Ward's Damages May Be Offset by Special Benefits from the Transit-Oriented Development Overlay Plan**

Victoria Ward disputes HART's ability to offset just compensation by the total sum of benefits arising out of the Kakaʻako Community Development District Transit-Oriented Development ("TOD") Overlay Plan.

The HCDA completed an initial draft of the TOD Overlay Plan in 2013 with the intent of fostering urbanized development and greater residential density in proximity to public transit. The TOD Overlay Plan final draft was published in 2016, and it highlights numerous forms of incentive-based zoning in which portions of Ward Village received a more generous maximum floor area ratio ("FAR") compared to pre-existing standards in the Master Plan Permit in the absence of the TOD Overlay Plan. FAR refers to the ratio of a building's gross floor area to the size of the piece of land on which it is built. Maximum-allowable

FAR may be capped through zoning regulations, with lower maximum FAR values being associated with reduced allowable residential density.

Most importantly for this appeal, the final draft TOD Overlay Plan specifies a maximum allowable FAR much greater than that allowed under the Master Plan Permit. This increase in FAR is a significant benefit to Victoria Ward, with HART alleging that the density increase would allow Victoria Ward to build millions of additional square feet of floor area. A final TOD Overlay Plan has not yet been adopted by the legislature despite HCDA support, and HART largely blames Victoria Ward for the delay.

In support of its position, HART highlights representations anticipating a "density increase triggered by mass transit" in the Master Plan Submittal. HART also points to communications by Victoria Ward executives implying that they intentionally left portions of Ward Village underdeveloped in order to later exploit more generous development rules after the Master Plan Permit expires in 2024, but that these plans were scrapped due to the availability of greater development flexibility and affordances provided by the TOD Overlay Plan. Specifically, Victoria Ward appears to have anticipated the potential for eleven new towers totaling millions of additional square feet as a result of future TOD benefits. HART's

appraiser estimated that the potential future buildable floor area as a result of the TOD Overlay Plan would add a total $30 million in value to Ward Village. HART seeks to treat this increase in value as a "special benefit" that can be used to offset total just compensation.

The circuit court granted Victoria Ward's MPSJ No. 2, reasoning that the question of special benefits arising from the TOD Overlay Plan was too speculative and would lead to jury confusion. We review the circuit court's summary judgment decision de novo. See Gump v. Wal-Mart Stores, Inc., 93 Hawai'i 417, 420, 5 P.3d 407, 410 (2000).

State v. Midkiff involved a similar special benefits claim. 55 Haw. at 194-97, 516 P.2d at 1254-56. There, the jury heard expert testimony claiming that the remaining parcels would "probably be rezoned to a higher industrial use[,]" based on their "irregular shape . . . and the unsuitability of the [remaining parcels] for any other use due to their position on the freeway." Id. at 194, 516 P.2d at 1253 (emphasis added). This court upheld the condemnee's right to present their probabilistic argument to a jury in a partial takings case. Id. at 193, 516 P.2d at 1253 ("Since reasonable possibility of rezoning is a valid consideration in determining the market value of land actually taken, we see no reason why the same rule should not apply to establishing the market value of remnant

parcels and thus the enhancement value attributable to the taking."). Thus, the applicable standard here, where HART asserts the existence of <u>future special offsetting benefits</u> in a partial taking case, is a "reasonable probability" test. <u>See</u> <u>id.</u> ("The state has urged that when a partial taking enhances the remainder lands by creating a <u>reasonable probability</u> of rezoning to a higher use, the remnant parcels may be specifically benefited by the taking. We agree." (emphasis added)). This standard is consistent with that applied <u>supra</u> in the discussion of the Lost Tower and speculative damages.

Once a "reasonable argument is made for . . . a probable use," evidence relating to offsetting special benefits should be considered by a jury. <u>Market Place</u>, 55 Haw. at 243, 517 P.2d at 19-20; <u>see</u> <u>State v. Martin</u>, 54 Haw. 167, 170, 504 P.2d 1223, 1226 (Haw. 1973) ("This court has taken the position that in a condemnation case such as this one, 'any evidence which will aid the jury in fixing the fair market value of the property should be considered by them.'").

As set forth below, there is sufficient evidence to establish a genuine issue of material fact as to whether the TOD Overlay Plan is reasonably probable.

HART correctly notes that the Honolulu Department of Planning and Permitting has completed eight different TOD plans spanning 19 rail station areas outside of Kaka'ako. Further, the

TOD Overlay Plan relevant to this appeal has the support of key stakeholders like HCDA.

HART also points to the testimony of Anthony Ching, the HCDA Executive Director from 2008—2015, who attested that "[a] TOD Station Planning Area for Kaka'ako has already been identified, and substantial work has already been done toward the creation and adoption of the TOD Overlay Plan." Additionally, a "final draft" TOD Overlay Plan already exists.

On the other side of this dispute, Victoria Ward and its experts note the speculative nature of the TOD Overlay Plan and question the notion that Victoria Ward would be willing and able to build additional structures on Ward Village.

The question of whether a future use or benefit is reasonably probable is a fact-intensive inquiry. A jury should discern whether the TOD Overlay Plan was reasonably probable, and if so, the likely value of any special benefits to Victoria Ward arising from the TOD Overlay Plan.

Finally, HART is correct in asserting that the TOD Overlay Plan is a special offsetting benefit, as opposed to a general benefit. See City & Cnty. of Honolulu v. Collins, 42 Haw. 199, 213 (Haw. Terr. 1957) ("[A] general benefit cannot be considered as an offset to the value of the owner's property in condemnation. Only a special and direct benefit may be offset against value of property taken.").

The TOD Overlay Plan has a "reasonable probability" of affording Victoria Ward specific upzoning opportunities that are peculiar to Victoria Ward's relationship to the neighborhood as a developer of residential units in the vicinity of the Kakaʻako Station. Specifically, the TOD Overlay Plan, if enacted, would function similarly to a rezoning.

Here, the TOD Overlay Plan would increase residential density, allowing Victoria Ward to expand Ward Village and sell a greater number of units. This opportunity for greater residential density is akin to upzoning, in that it constitutes an allowance for a denser or higher-value use. HART's appraisal expert included the TOD Overlay Plan in his appraisal report for Ward Village, stating, "I concluded that there is a reasonable probability of a TOD plan of some kind to be adopted and, more specifically, a reasonable probability — frankly, a near certainty — that the potential for a TOD plan would have impacted the value of the remainder property in the after condition[.]" (Emphasis omitted). Because the TOD Overlay Plan results in an outcome similar to rezoning, the existence of a reasonable probability of a future TOD Overlay Plan could legitimately be used by a jury to offset Victoria Ward's claimed damages.

Victoria Ward characterizes the benefits as "general benefits" because they will be "shared among multiple landowners

near the City Center [Kaka'ako] Station."  However, this court has clarified that special benefits do not become relegated to general benefits merely because other properties may be benefitted.  See Territory by Sylva v. Mendonca, 46 Haw. 83, 95-96, 375 P.2d 6, 13 (1962) ("[S]pecial benefits resulting from the fact that land abuts on a proposed road do not become general benefits merely because other properties which also front on the road and receive these same benefits have not been required to contribute to the road in property" (emphasis added)).

Because of the specific qualities associated with the benefits arising out of the TOD Overlay Plan, they are to be treated as special benefits for the purposes of offsetting any of Victoria Ward's damages.

Accordingly, we vacate the order granting Victoria Ward's MPSJ No. 2.

**F.   HART May Not Offset Victoria Ward's Just Compensation by the Total Value of Special Benefits to Land Block 3**

In a related appeal, HART contests the circuit court order granting Victoria Ward's MPSJ No. 3, which precludes HART from treating potential increases in density on Land Block 3 as special offsetting benefits to reduce the overall just compensation owed to Vicotria Ward.  This dispute concerns both

the same July 23, 2020 Joint Stipulation from Section IV(D) and the same TOD Overlay Plan from Section IV(E).

In appraising Land Block 3, HART's expert appraiser applied $15 million of "special benefits" arising on Land Block 3 to offset damages arising on other blocks of land. The $15 million of special benefits were related to increased development density allowable under the TOD Overlay Plan. The dispute here is whether these potential increases in density from the TOD Overlay can be treated as a special offsetting benefit, or if the July 23, 2020 Joint Stipulation language limits appraisers from only considering special benefits existent at the time of the 2009 Master Plan Permit.

On appeal, Victoria Ward contests the HART appraiser's treatment of future TOD-related benefits as a special offsetting benefit because the Joint Stipulation stated:

> 6. In evaluating the Land Blocks defined in the Master Plan, the Parties will use the following assumptions:
>
> . . .
>
> > c. As of the valuation date, Land Block 3 is fully built out to its highest and best use (i.e., the amount of FAR utilized as of the date of value is the final FAR allocation for Land block 3), both in the before and the after condition, and that any remaining FAR associated with Land Block 3 will be deemed transferred off Land Block 3."[7]

---

[7] The Stipulation's statement that Land Block 3 is built out to its highest and best use in both the before and after conditions does not necessarily preclude Victoria Ward's severance damages claims on Land Block 3. This is the case because the Joint Stipulation is specific to "the amount of FAR utilized" whereas Victoria Ward's severance damages claims for Land Block 3 concern loss of parking, loss of ingress and egress, and construction and noise. Because the Stipulation is specific to FAR, and because Victoria

(Emphases added.)

Victoria Ward argues the Joint Stipulation means that future development potential under the TOD Overlay Plan could not be counted as a special benefit, and that valuation of Land Block 3 must only account for special benefits existent at the time of the 2009 Master Plan Permit.

The circuit court's order granting Victoria Ward's MPSJ No. 3 is brief, largely reiterating the Joint Stipulation language:

> 1. As stated in paragraph 6 of the Joint Stipulation filed July 23, 2020, in evaluating the land blocks defined in the master plan, the parties will use the assumptions set forth in paragraph 6 of the Joint Stipulation, including the assumption set forth in paragraph 6(c) that, as of the valuation date, Land Block 3 is fully built out to its highest and best use, both in the before and the after condition, and any remaining floor area ("FAR") associated with Land Block 3 will be deemed transferred off Land Block 3.
>
> 2. Although the Court does not understand there to be any dispute on this point, at the Victoria Ward Defendants' (also referred to as Howard Hughes') request, the Court also reaffirms paragraphs 5 and 5(b) of the Joint Stipulation, specifically that Plaintiff cannot offset any special benefits allegedly accruing on Land Block 3 against damages to any other land block, including Land Block 1 or Land Block 5.
>
> 3. In granting summary judgment, the Court is reaffirming the language in the Joint Stipulation, which says what it says.

---

Ward's damages claims relating to Land Block 3 do not concern the loss of developable floor area, the Stipulation does not preclude Victoria Ward's severance damages claims for Land Block 3.

However, because the special offsetting benefits to Land Block 3 relate to the TOD Overlay Plan, and because the Joint Stipulation states that FAR in the before and after conditions are the same, this discussion concludes that HART may not use future increased density on Land Block 3 to offset Victoria Ward's compensable damages.

(Emphases added.)

The parties dispute the meaning of not only the Joint Stipulation, but also the circuit court order granting Victoria Ward's MPSJ No. 3. The order does not explicitly state that it precludes HART from arguing in favor of $15 million of special benefits arising from future development on Land Block 3 pursuant to the TOD Overlay Plan, though Victoria Ward argues in favor of such a reading in this appeal.

We affirm the circuit court's order granting Victoria Ward's MPSJ No. 3. The Joint Stipulation's text is clear that "the amount of FAR utilized as of the date of value is the final FAR allocation for Land Block 3." (Emphases added.) This language indicates that HART is precluded from treating potential increases in density from the operation of the TOD Overlay Plan on Land Block 3 — which were non-actualized at the time of valuation — as special offsetting benefits.

The Joint Stipulation clearly limits the parties: they must treat Land Block 3 as "fully built out to its highest and best use . . . both in the before and the after condition." The terms "utilized" and "final" in the Joint Stipulation are particularly meaningful, and they indicate an agreement between the parties that for appraisal purposes, the parties were to assume that no further development would take place on Land Block 3. This interpretation is consistent with the surrounding

76

phrasing: "Land Block 3 is fully built out to its highest and best use." Unrealized, tentative increases in development are not to be considered by appraisers.

HART repeatedly suggests that Victoria Ward is flip-flopping on issues related to Land Block 3. The circuit court even used Victoria Ward's arguments in favor of Victoria Ward's MPSJ No. 3 to help form its ruling <u>against</u> Victoria Ward in the order granting HART'S MPSJ No. 10 (at issue in SCAP-22-340):

> When the Court refers to how the parties have treated the stipulation, the Victoria Ward, Ltd. Defendants' argument in support of their Third Motion for Partial Summary Judgment . . . included the statement that "because the parties have stipulated that Land Block 3 is a separate larger parcel, all claims as to Land Block 3 including severance damages and offsetting special benefits must be assessed separate and apart from all other claims related to any land blocks in Ward Village."

Again, the issues in HART'S MPSJ No. 10 are distinct from those in Victoria Ward's MPSJ No. 3, and it therefore follows that Victoria Ward's arguments regarding the latter do not necessarily reflect their position regarding the former. HART'S MPSJ No. 10 focused on the effect of Paragraph 5 of the Joint Stipulation, in which the parties agreed that Land Block 3 is a "distinct larger parcel" for the purposes of analyzing severance damages or special benefits. But the operative section in Victoria Ward's MPSJ No. 3 is Paragraph 6 — a provision that explicitly applies to the dispute at hand. Further, with regard to any arguments Victoria Ward made in

support of treating Land Block 3 as a distinct parcel in its memorandum in support of Victoria Ward's MPSJ No. 3, those arguments are not applicable to HART'S MPSJ No. 10 because the Joint Stipulation clearly explains how the parties should treat special benefits: "Plaintiff cannot offset any special benefits allegedly accruing on Land Block 3 against damages to other Land Blocks."

The Joint Stipulation language is silent on damages, but clear and specific to the question of applying special benefits from Land Block 3 (where no physical taking was executed) to Land Blocks 1 and 5 (where takings were executed). Because of the stark differences between HART'S MPSJ No. 10 and Victoria Ward's MPSJ No. 3, Victoria Ward's statements in support of Victoria Ward's MPSJ No. 3 are not necessarily contradictory with its position against HART'S MPSJ No. 10.

Finally, a stipulation binds parties unless there is a reason to set it aside. Gardner, 149 Hawai'i at 300, 488 P.3d at 1279. We discern no reason to set aside the Joint Stipulation here. See Tax Appeal of Subway Real Estate Corp. v. Director of Taxation, State of Haw., 110 Hawai'i 25, 38, 129 P.3d 528, 541 (2006) ("[S]tipulations may be set aside in order to prevent manifest injustice." (quotation omitted)). The Stipulation is clear, affecting the rights of the parties in a manner that is enforceable and consistent with sound public policy. See

78

Provident Funding Assocs., 149 Hawai'i at 296, 488 P.3d at 1275 ("[A]ll such stipulations not unreasonable, not against good morals or sound public policy, have been and will be enforced[.]") (quoting Okuhara v. Broida, 51 Haw. 253, 256–57, 456 P.2d 228, 230–31 (1969)). There is no reason to set aside the Joint Stipulation here.

Accordingly, we affirm the circuit court order granting Victoria Ward's MPSJ No. 3. The Joint Stipulation prohibits HART from applying, on Land Block 3, the purported special benefits arising from the TOD Overlay Plan.

**G.** **HART Established a Genuine Dispute of Material Fact as to the Special Benefits Associated with Utility Grounding**

HART sought to offset just compensation owed to Victoria Ward by $2.7 million on the basis of HART's undergrounding of electrical utilities along Halekauwila Street and Queen Street adjacent to Land Block 1 and Land Block 5. HART argues that this undergrounding work constituted a special offsetting benefit to Victoria Ward. HART clarifies that the special benefit to Victoria Ward was "direct cost savings" as opposed to aesthetic, safety, or efficiency benefits, which are more broadly shared with other landowners in the area and the general public.

The key questions here are whether (1) Victoria Ward would have completed the work of undergrounding utilities at its

own expense but for HART's completion of the work and (2) the undergrounding work constitutes a general benefit or special benefit.

The circuit court ruled that HART was required to underground the electrical utilities "for its own benefit and not the benefit of any of the surrounding landowners, . . . [t]he rail project cannot be constructed without this utility modification." Second, the circuit court ruled that any downstream benefits were deemed "general benefits" that cannot offset Victoria Ward's right to just compensation.

HART should not be allowed to offset total just compensation owed to Victoria Ward by $2.7 million for undergrounding work that HART would have completed anyway. However, given the genuine dispute of material fact as to whether Victoria Ward or HART would have had to complete the undergrounding work, we vacate the order granting Victoria Ward's MPSJ No. 4 and remand for trial.

HART argues that Victoria Ward was required to bear the cost of the undergrounding work as part of the 2005 Mauka Rules and based on Victoria Ward's representations to HCDA. This point is disputed. HART relies on the fact that the 2005 Mauka Rules required undergrounding of utilities. However, the Mauka Rules do not specify which entity should bear the cost. See HAR § 15-22-76 (repealed 2011) ("Public utility companies

shall place utility lines underground within the mauka area."). Further, the Master Plan Permit contained no provision specifying that Victoria Ward would be responsible for undergrounding utilities.

Victoria Ward's individual building permit applications also are ambiguous and do not favor one party over the other. Building permit applications refer to "new underground utility lines" and state that "[a]ll utilities will be underground," without specifying who would be responsible for the construction work.

HART argues that the Master Plan Submittal implies that Victoria Ward or its predecessor in interest, GGP, would complete the undergrounding work. The Master Plan Submittal states:

> While no major additions to the utility infrastructure in the area are required for development of Ward Neighborhood, planned undergrounding of the electrical utilities will help create a community that is safer and more pleasing to the eye for residents and visitors.
>
> . . .
>
> It is recommended that all overhead utilities be placed underground within the development boundaries.
>
> . . .
>
> The Master Plan is guided by clearly articulated design standards. . . . These standards include:
>
> > Undergrounding of utilities to remove visual clutter[.]

(Emphasis added.)

81

The references to underground utilities in the building permit applications and the Master Plan Submittal do not definitively place the burden of undergrounding on either party. Drawing all reasonable inferences in favor of HART, the evidence is sufficient to establish a genuine dispute of material fact.

As previously noted, a significant question in partial takings involving benefits to the remaining land is whether the benefits are "general benefits" or "special benefits." Here, the record does not establish whether cost savings from the undergrounding work constitutes a general or special benefit. It is unclear whether other property owners elsewhere along the HART rail route were required to pay for the construction work. Similarly, there is a dispute as to the extent and types of benefits from undergrounding. HART argues that the benefits of undergrounding extend specifically to Ward Village, whereas Victoria Ward cites to an appraiser's statement specifying that HART's undergrounding work was conducted on utility lines "along public streets involv[ing] property owned by others, not just Victoria Ward."

HART argues that the benefit is "direct cost savings," rather than aesthetic, safety, or efficiency benefits. In contrast, Victoria Ward asserts that the "aesthetic, safety, and efficiency benefits from the undergrounding" are enjoyed by all

landowners in the area.  The circuit court agreed with Victoria Ward, ruling that "[i]f there are benefits from HART's undergrounding of the utilities . . . this is not peculiar or special to Ward Village.  All landowners in the area enjoy aesthetic, safety, and efficiency benefits from the undergrounding.  As such, as a matter of law, these benefits are general and not specific."

The circuit court erred in granting summary judgment on that issue.  There are disputes of fact that must be resolved by a jury to determine whether undergrounding the utilities constitutes a general benefit or a special benefit in this specific context.  For the foregoing reasons, we vacate the order granting Victoria Ward's MPSJ No. 4.

**H.  This Court Lacks Jurisdiction to Review Appeals of the Circuit Court Order Granting in Part and Denying in Part HART's Motion to Strike**

In addition to appealing four partial summary judgment orders, HART appeals a circuit court order granting in part and denying in part HART's motion to strike the declarations of former HCDA Board members Steven J. Scott and Brian Lee.  The circuit court denied HART's Motion to Strike in full as it relates to Scott's declaration, and granted it in part as to paragraphs 14 and 16 of Lee's declaration.

HART moved to dismiss these interlocutory appeals for lack of jurisdiction because these appeals, they argue, do not

satisfy HRS § 641-1(b)'s requirement that interlocutory appeals from the circuit court's civil docket be "advisable for the speedy termination of litigation[.]"  HRS § 641-1 (2004).

We may grant a dismissal motion "on any or all appropriate grounds disclosed by any or all the papers of record in the case."  Waterhouse, 44 Haw. at 238, 353 P.2d at 1011 (quotation omitted).

This court lacks jurisdiction to review the circuit court's order granting in part and denying in part HART's Motion to Strike.  The circuit court's order granting leave to file interlocutory appeals only provided that HART could "cross-appeal . . . any of the adverse rulings on the Motions for Partial Summary Judgment[,]" clarifying in a footnote that "[t]he adverse rulings on the Motions for Partial Summary Judgment as to HART are the orders granting the Victoria Ward Defendants' Motions for Partial Summary Judgment Nos. 1, 2, 3, and 4[.]"  (Emphasis added.)  We accordingly dismiss HART's appeal.

## I.   The Circuit Court Did Not Err in Pausing the Accrual of Blight of Summons Interest During the Length of This Appeal

Victoria Ward appeals the circuit court's order pausing the accrual of blight of summons interest during the pendency of the interlocutory appeals.  We review the circuit

court decision to stay the accrual of interest for abuse of discretion.

Under Hawai‘i law, a condemnor who uses the HRS § 101-29 "quick-take" procedure is required to estimate the amount of just compensation and damages and deposit that sum with the court. HRS §§ 101-25, -32, -33 (2012). If the jury awards the condemnee an amount greater than the deposit, the condemnee is also awarded interest on the difference, as accrued from the date of the taking. Id.; Hanalei River Holdings Ltd., 139 Hawai‘i at 523-24, 394 P.3d at 753-54 (2017). This interest is referred to as blight of summons damages, and blight of summons damages constitute an element of a landowner's constitutional right to just compensation. See Pioneer Mill, 64 Haw. at 184, 637 P.2d at 1142.

In addition to compensating condemnees, an award of blight of summons damages incentivizes condemnors to avoid delay and to more accurately estimate just compensation to be deposited with the court, so as to reduce the award of blight of summons damages. See Market Place, Ltd., 55 Haw. at 239—40, 517 P.2d at 18; Mt. San Jacinto Cmty. Coll. Dist. v. Super. Ct., 151 P.3d 1166, 1172 (Cal. 2007).

Here, HART estimated Victoria Ward's total just compensation at $13.67 million, and deposited that amount with the clerk of court. The question on appeal concerns the circuit

court's order to pause accrual of interest on that value over the duration of the interlocutory appeals — a request made by HART.

We hold that the circuit court properly exercised its discretion to pause the accrual of statutory interest for the duration of the appeals. Just compensation requires a balancing between the landowner's interest and the public's interest in reducing costs associated with takings. See Bonded Inv. Co., Ltd., 54 Haw. at 394, 507 P.2d at 1091 (noting that to award condemnees "less than the value of the property taken would be unjust to [them]; to award [them] more than its value would be unjust to the public." (quotation omitted)).

Victoria Ward argues that the interlocutory appeals were requested by both parties in order to accelerate the ultimate termination of the litigation, thereby diminishing the equitable basis for pausing interest in HART's favor. Victoria Ward is correct that HART appealed several circuit court orders, but the delay was initially triggered by Victoria Ward's request for leave to file an interlocutory appeal, which HART opposed both in the circuit court and on appeal. Out of ten appeals and one cross-appeal before this court, nine were brought by Victoria Ward. HART opposed Victoria Ward's request for an interlocutory appeal, arguing that an interlocutory appeal would not result in speedy termination of litigation because "an

interlocutory appeal . . . is likely to result in the case 'oscillating between the original and appellate courts,' including future appeals of other orders, resulting in further delay and needless waste of time, money, and judicial resources."  HART filed motions to dismiss every single one of Victoria Ward's interlocutory appeals, and even notes that it filed its singular appeal "only to preserve its rights" and that HART would not have otherwise filed an interlocutory appeal.

The circuit court chose to disallow the accrual of statutory interest for the period of the interlocutory appeals, the overwhelming majority of which were initiated by Victoria Ward and opposed by HART.  Seeing no abuse of discretion, we affirm the circuit court's order.

## V.    CONCLUSION

To summarize, we affirm the circuit court orders granting HART's MPSJ Nos. 2 and 7, and the orders granting Victoria Ward's MPSJ Nos. 1 and 3.  We affirm the order granting HART's MPSJ No. 1 as to paragraphs 1(a), 1(c), 1(d), and 2 but vacate with regard to paragraph 1(b).  We also affirm the order pausing the accrual of blight of summons damages during the length of this interlocutory appeal.

We vacate the orders granting HART's MPSJ Nos. 3, 5, 9, 10, and 11, and the orders granting Victoria Ward's MPSJ Nos. 2 and 4.

We dismiss HART's cross-appeal regarding the circuit court order denying HART's motion to strike the declaration of J. Douglas Ing and dismiss HART's appeal of the court order granting in part and denying in part HART's motion to strike the declarations of Brian Lee and Steven J. Scott.

While we appreciate the circuit court's efforts to narrow the issues for trial, genuine issues of material fact were raised, precluding summary judgment in the instances noted above. We remand for further proceedings consistent with this opinion.

David A. Battaglia,*
Tiaunia N. Henry,*
Courtney M. Johnson,*
Mark M. Murakami,
Gregory W. Kugle,
Joanna C. Zeigler,
Nicholas K. Ernst,
for appellants

Terence J. O'Toole,
Sharon V. Lovejoy,
Lindsay E. Orman,
Richard E. Rayl,*
Ronald M. Cole,*
Dana M.O. Viola,
Paul S. Aoki,
Rozelle A. Agag,
for appellee

*pro hac vice

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ R. Mark Browning

/s/ James S. Kawashima

